Michael S. Sorgen (CSB No. 43107)
Andrea Adam Brott (CSB No. 121288)
Ryan L. Hicks (CSB No. 260284)
LAW OFFICES OF MICHAEL S. SORGEN
Richard A. Hoyer (CSB No. 151931)
HOYER & ASSOCIATES
240 Stockton, 9th Floor
San Francisco, CA 94108
Telephone: (415) 956-1360
Fax: (415) 276-1738
msorgen@sorgen.net
rhicks@sorgen.net

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JUANITA STOCKWELL, *et al.*,<br><br>    Plaintiffs,<br><br>  v.<br><br>CITY AND COUNTY OF SAN FRANCISCO,<br><br>    Defendant.<br>_____ | Case No. C 08-05180 PJH<br><br>**PLAINTIFFS' RENEWED MOTION AND NOTICE OF MOTION FOR CLASS CERTIFICATION AND; MEMORANDUM IN SUPPORT THEREOF; MOTION FOR APPOINTMENT OF CLASS COUNSEL**<br><br>**[Filed Concurrently: (Proposed) Order Granting Motion for Class Certification]**<br><br>Date: July 20, 2011<br>Time: 9:00 a.m.<br>Courtroom: 3rd floor, Courtroom 3<br>  Oakland Federal Courthouse |

## TABLE OF CONTENTS

I.     Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.    Statement of Facts and Procedural History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III.   The Statistical Evidence Shows that the City's Employment Practice Has Had a
       Substantial Disparate Impact on the Putative Class. . . . . . . . . . . . . . . . . . . . . . . 6

IV.    Class Representatives . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

V.     Argument for Class Certification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

VI.    Predominance and Superiority Under Rule 23(b)(3) . . . . . . . . . . . . . . . . . . . . . . . 20

VII.   Notification of Class Members Under Rule 23(c)(2)(B) . . . . . . . . . . . . . . . . . . . . . 24

VIII.  Motion for Appointment of Class Counsel Under Rule 23(g) . . . . . . . . . . . . . . . . . 24

IX.    Conditional Certification of a Collective Action on the ADEA Claim is Appropriate.
       . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

X.     Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

1

## TABLE OF AUTHORITIES

2

3

**FEDERAL CASES**

4

5
*Adams v. Ameritech Services, Inc.,* 231 F.3d 414 (7th Cir., 2000) . . . . . . . . . . . . . . . . . . 16, 18

*Aguilera v. Cook County Police & Corrections Merit Board,* 760 F.2d 844 (7th Cir. 1985) . . . 17

6

*Allen v. Seidman,* 881 F.2d 375 (7th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

7

*Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

8

*Amigo, et al. v. Civil Service Commission et al.,* San Francisco Superior Ct. Case No. 09-509716 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

9

*Blackie v. Barrack,* 524 F.2d 891(9th Cir. 1975), *cert. denied,* 429 U.S. 816 (1976) . . . . . . . 11

10

*Dukes v. Wal-Mart Stores, Inc.,* 603 F.3d 571 (9th Cir. 2010), *cert. granted in part by* 131 S. Ct. 795 (U.S. Dec. 6, 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 14-16, 20

11

12

*Eisen v. Carlisle & Jacquelin*, 417 U.S. 1568 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

13

*Equal Employment Opportunity Comm'n v. Gen. Tel. Co. of Northwest, Inc.,*885 F.2d 575 (9th Cir. 1989), *cert. denied,* 498 U.S. 950 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

14

15

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

16

*Hanon v. Dataproducts Corp.*, 976 F.2d 497 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . 11

17

*Harris v. Palm Spring Alpine Estates, Inc.*, 329 F.2d 909 (9th Cir. 1964) . . . . . . . . . . . . . . . 12

18

*Hemmings v. Tidyman's Inc.,* 285 F.3d 1174 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . 15, 16, 18

19

*Hoffman-La Roche v. Sperling,* 493 U.S. 165 (1989) . . . . . . . . . . . . . . . . . . . . . . . 24, 25

20

*Kimel v. Florida Bd. of Regents,* 528 U.S. 62 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

21

*Lady v. County of Los Angeles*, 770 F.2d 1421 (9th Cir.1985), *cert. denied*, 475 U.S. 1109 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

22

23

*Moore v. Hughes Helicopters, Inc.*, 708 F.2d 475 (9th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . 11

*Rose v. Wells Fargo*, 902 F.2d 1417 (9th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

24

*Sanchez v. City of Santa Ana,* 928 F. Supp. 1494 (C.D. Cal. 1995) . . . . . . . . . . . . . . . . . . . . 6

25

*Sobel v. Yeshiva Univ.,* 839 F.2d 18 (2d Cir.1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

26

*Sperling v. Hoffman-LaRoche, Inc.,* 118 F.R.D. 392 (D.N.J.1988), *aff'd in part on other grounds and appeal dismissed in part on other grounds,* 862 F.2d 439 (3d Cir.1988), *aff'd and remanded on other grounds,* 493 U.S. 165 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

27

28

*Ward's Cove Packing v. Antonio*, 490 U.S. 642 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . 11

FEDERAL STATUTES

29 U.S.C. § 621, *et seq.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 24, 25

Fed. R. Civ. P. 23 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-12, 20, 22-24

STATE STATUTES

Cal. Gov. Code § 12900, *et seq.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

2 Cal. Code. Reg. § 7286.7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

## NOTICE OF MOTION AND MOTION

TO DEFENDANT CITY AND COUNTY OF SAN FRANCISCO ("CITY")AND ITS COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on July 20, 2011, at 9:00 a.m., or as soon thereafter as the matter may be heard in Courtroom 3 of the Northern District of California, located at 1301 Clay Street, Suite 400 S, Oakland, California, the Renewed Motion of Plaintiffs JUANITA STOCKWELL *et al.* for Class Certification and for Appointment of Class Counsel will come on regularly for hearing.

This Renewed Motion is brought pursuant to Federal Rule of Civil Procedure 23 and Local Rule 7-2 on the grounds that the City discriminated against the proposed class herein on the basis of their age by assigning much younger sergeants to investigative positions traditionally held by Assistant Inspectors, thereby entirely preventing the promotion of class members. The City's actions had a disparate impact based on age on this class that violates the California Fair Employment and Housing Act, Cal. Gov. Code § 12900, *et seq.* ("FEHA") and the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.* ("ADEA").[1] Plaintiffs request an order certifying the class as defined in this Motion and appointing Plaintiffs' counsel as Class Counsel.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   Introduction

Beginning in 2007, the City and County of San Francisco (hereinafter "the City" or "Defendant") changed its employment practice, from utilizing the P-5 Q-35 Assistant Inspector eligibles list (hereinafter, the "Q-35 List"), to using the P-27 Q-50 Sergeant eligibles list adopted on February 1, 2007 (the "Q-50 List") exclusively, in order to make investigative appointments during 2007 to 2009. If CCSF had not abandoned the Q-35 List and instead had made investigative appointments from that list, the resultant appointments would have included far higher counts of older individuals than occurred by CCSF's discriminatory use of the Q-50 List alone. CCSF's actions had a disparate impact based on age on the putative class that violates the FEHA and the

---

[1]Section IX of the Memorandum, *infra*, discuss Plaintiffs' request to conditionally certify the ADEA claim for notice purposes. This Memorandum focuses on certification of the FEHA claims because the FEHA requires a higher standard of defense for the City to prove.

ADEA. Plaintiffs seek to certify a class with regard to their claims under the FEHA and conditionally certify for notice purposes a collective action for their ADEA claims.

The proposed class consists of San Francisco Police Department ("SFPD") officers who were aged forty and older as of each of the dates of the challenged appointments in 2007, 2008, and 2009 and who could have been appointed to investigative positions had the City properly made appointments from the Q-35 List. There is no dispute that the proposed class members qualified and were eligible for the disputed positions; the SFPD deemed them so by awarding them places on the Q-35 List, which the City's Civil Service Commission ("CSC") ruled was still current and active at the time of all the investigative appointments.[2] The proposed class members were all injured by the City's discriminatory practice and seek a share of the only remedy that can be fashioned by the Court for the City's violations of FEHA and ADEA (discussed in Section VI, *infra*).

## II.  Statement of Facts and Procedural History

All members of the proposed class are or were[3] on the Q-35 List (Ex. 1 to the Declaration of Michael S. Sorgen filed and served herewith ("Sorgen Dec.")), thereby making each such officer qualified and eligible to do investigative work according to the City's own witnesses' testimony. The City properly made appointments from the Q-35 List from the date of its adoption through February 2006. Thereafter, however, the City made no appointments from that list.

In August 2007, then-Chief Heather Fong abandoned the Q-35 List completely and appointed fifty-one (51) officers from the Q-50 List (Ex. 2 to the Sorgen Dec.). Although officers on the Q-35 List had already been deemed "qualified" for investigative positions for nine years before the officers on the Q-50 List were similarly deemed qualified, the City appointed thirty-five (35) of the fifty-one Sergeants appointed from the Q-50 List to positions within SFPD's

---

[2] During October 2010, the City administered new examinations for both the Q-35 Assistant Inspector and Q-50 Sergeant classifications, and has since approved the resulting eligibles lists. Reversing its discriminatory practice of 2007-2009, the City has begun appointing officers from each list, a practice that Plaintiffs do not challenge in this action.

[3] Some members of the proposed class were on that list but have since been promoted to other positions within SFPD, retired, or otherwise left the SFPD.

1  Investigations Bureau to do work that had been traditionally performed by Q-35 Assistant Inspectors

2  and 0380 Inspectors.[4]  In September 2008, Chief Fong made at least two more appointments from

3  the Q-50 List and assigned those Sergeants to work out of class in the Investigations Bureau, doing

4  work traditionally performed by Q-35 Assistant Inspectors.  ("Q50 List – Dates of Birth and Dates

5  of Appointment Assignments to Investigations Bureau," Ex. 3 to the Sorgen Dec.). The City refused

6  to **consider** appointing any qualified officers on the Q-35 List to those investigative positions, even

7  though the Q-35 List remained active as of August 25, 2007.  (Civil Service Commission ("CSC")

8  Feb. 2, 2009 Statement of Decision (finding that the Q-35 List was active as of February 2, 2009

9  and would remain active until a new list was adopted to replace it), Ex. 4 to the Sorgen Dec. at 4).

10      Plaintiffs filed their complaint challenging the employment practice described above on

11  November 11, 2008.  They filed an amended complaint to add additional individual plaintiffs on

12  December 5, 2008.

13      It is undisputed that the Sergeants appointed from the Q-50 List in August 2007 and in

14  September 2008 and assigned to the Investigations Bureau were performing the job of Assistant

15  Inspectors.  (Ex. 4 to the Sorgen Dec., at 3).  Moreover, on February 2, 2009, the Civil Service

16  Commission determined that the thirty-five Sergeants appointed in 2007 were working "out of

17  class" in Assistant Inspector positions.  (Id. at 3-4).  During October, 2010, per the CSC's Order

18  (id., at 7), the City administered a new hybrid examination for both the Q-35 Assistant Inspector

19  and the Q-50 Sergeant classifications, which are now *both* tested for investigative knowledge, skills,

20  and attributes ("KSAs"), and has since approved the resulting eligibles lists.  (See Q-35 and Q-50

21  eligibles lists approved February 1, 2010, Exs. 5 and 6 to the Sorgen Dec., respectively).

22      On October 22, 2009, shortly after taking over as head of the SFPD, then-Chief George

23  Gascon announced a "reorganization" of SFPD, including the "redeployment" of Inspectors (and

24  Sergeants who had been assigned in 2007 and 2008 to the Investigations Bureau to do Assistant

25  Inspectors' work out of class) to investigative teams at SFPD district stations throughout the City.

26  (SFPD Press Release "10/22/09 09-113", Ex. 7 to the Sorgen Dec.; 11/13/09 Declaration of George

27

28      [4]After a two-year probationary period, Q-35 Assistant Inspectors are automatically promoted to the 0380 Inspector class.  Accordingly, these ranks are often referred to synonymously.

Gascon, Ex. 8 to the Sorgen Dec.). Then-Assistant Chief Morris Tabak, former head of the SFPD Investigations Bureau, testified that these redeployed investigators, while working in different places, were performing "the same job" that they had been performing when they were physically working in the Investigations Bureau prior to the "redeployment." (Transcript of Deposition of Morris Tabak ("Tabak Depo.) at 10:9-13:12; 49:12-51:1, Ex. 9 to the Sorgen Dec.).

In the same press release announcing the foregoing "redeployment" of "investigators," Chief Gascon also announced that he intended to promote a number of new Sergeants. (Ex. 7 to the Sorgen Dec., at ¶6), and on November 14, 2009, he promoted forty-five (45) officers from the Q-50 Sergeant List. (Ex. 10 to the Sorgen Dec.). Of those forty-five (45) appointments, and despite the pendency of this lawsuit and the putative class's claims of disparate impact based on age, fourteen (14) of them were assigned to "Investigative Teams" at district stations to perform work traditionally performed by Assistant Inspectors. ("Station Investigative Teams" Roster, Ex. 1 to the Declaration of Juanita Stockwell ("Stockwell Dec.") filed and served herewith). Another four (4) of those November 2009 appointees were assigned to perform work traditionally performed by Assistant Inspectors and Inspectors on units (Gang Task Force, Crime Scene Investigations and Narcotics) that had been a part of the Investigations Bureau.[5]  (Ex. 10 to the Sorgen Dec.).

For the third consecutive year, the appointments were made exclusively from the Q-50 List, despite the City's knowledge that Plaintiffs were challenging the City's use of the same employment practice in 2007 and 2008. The City pressed ahead with the new disputed assignments despite the fact that the City had just administered examinations for both the Q-35 and Q-50 classifications on October 22, 2009, and that new eligibility lists were forthcoming.[6]  Again, the City steadfastly refused to appoint any officers from the soon-to-expire Q-35 List, or to wait to appoint officers from

---

[5] As part of the "redeployment and reorganization," the Investigations Bureau was "collapsed" into another Bureau within SFPD, the "Field Operations Bureau." (See Ex. 7 to the Sorgen Dec.).

[6] Plaintiffs do not challenge either of the recent 2009 examinations, nor do they intend at this time to challenge any appointments made from the respective resulting eligibility lists, which the City adopted on February 1, 2010.

the new eligibility lists derived from the examinations it had just administered, thereby compounding the damage and expanding the proposed class.

Plaintiffs filed their Supplemental Complaint on April 20, 2010 challenging the aforementioned November 2009 appointments..

On May 12, 2010, Plaintiffs filed a Motion for Class Certification and Appointment as Class Counsel that was heard by this Court on June 16, 2010. That Motion was denied by Order filed August 27, 2011 (the "Order"). Although this Court found that Plaintiffs had satisfied three of the four requirements for class certification under Rule 23(a): "numerosity," "typicality," and "adequacy of representation" (see Order, at 6:16-9:1, 14:11-16:5 and 16:6-18:6, respectively), the Court ultimately denied the Motion based on its finding that Plaintiffs had not satisfied Rule 23(a)'s "commonality" requirement because of various alleged deficiencies in its expert's statistical analysis and methodology and because Plaintiffs allegedly failed to satisfy Rule 23(b)(3)'s "predominance" and "superiority" requirements.[7]

Since the Court denied Plaintiffs' initial Motion for Class Certification, Plaintiffs have had their expert provide a clear and fully-supported report so as to address all of the issues raised by the Court's Order, have eliminated the trial management issues which concerned the Court, and now seek to have the Court grant their Motion for Class Certification and Appointment of Class Counsel.[8]

In October 2010, the City resumed appointing Q-35s to investigative positions, as they had in all previous years except 2007-2009, utilizing the new Q-35 eligibles list it approved earlier that year. (SFPD Personnel Order No. 21, Ex. 2 to the Stockwell Dec.).

---

[7]Id., at 9:2-14:8; 18:11-20:2. These alleged deficiencies are discussed in more detail in Sections V.C.2.a.-c. and VI, *infra.*

[8]For the sake of brevity and for the convenience of the Court, and because, to Plaintiffs' knowledge, no relevant facts have changed since this Court's Order was entered on August 27, 2010 that would impact the Court's previous findings that Plaintiffs had satisfied the numerosity, typicality, and adequacy requirements under Rule 23(a), Plaintiffs have not reiterated their arguments on these issues in this Brief. Plaintiffs respectfully request under Federal Rule of Evidence 201 that this Court take judicial notice of those arguments, contained in Plaintiffs' previous Opening Brief, at 11-12 and 13-14, and previous Reply Brief at 13-15.

On November 3, 2010, Plaintiffs filed their Motion for Leave to File Second Amended Complaint, to Dismiss and to Sever for the purposes of narrowing the complaint specifically to address the Court's concerns about manageability. As a result of that motion, all individual disparate treatment claims have been dismissed, and all Plaintiffs who were not included within the proposed class have dismissed all of their claims. On January 21, 2011, the Court Granted the motion in part and denied it in part. On February 16, 2011, Plaintiffs filed their second amended complaint, which contains only claims of disparate impact age discrimination by plaintiffs who are members of the proposed class.

## III. The Statistical Evidence Shows that the City's Employment Practice Has Had a Substantial Disparate Impact on the Putative Class.

To establish a *prima facie* case of disparate impact, a plaintiff must: "(1) identify the specific employment practices or selection criteria being challenged; (2) show disparate impact; and (3) prove causation; 'that is, the plaintiff must offer statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group.'" *Sanchez v. City of Santa Ana,* 928 F. Supp. 1494, 1499 (C.D. Cal. 1995) (quoting *Rose v. Wells Fargo*, 902 F.2d 1417, 1424 (9th Cir. 1990) (applying disparate impact analysis under ADEA and FEHA)).

"Once the plaintiff establishes a *prima facie* case of disparate impact, the burden shifts to the defendant who may either discredit the plaintiff's statistics or proffer statistics of his own which show that no disparity exists." *Rose,* 902 F.2d at 1424. The only defenses to proof of a disparate impact under the FEHA are "business necessity" and "job-relatedness." 2 Cal. Code. Reg. § 7286.7.

Here, the "specific employment practice or selection criteria being challenged" is the policy of making appointments exclusively from the Q-50 eligibility list to positions performing investigative work that has traditionally been performed by Q-35 inspectors, in lieu of appointing any qualified eligible Assistant Inspectors from the Q-35 List. As shown in the statistical analysis below, the causation requirement is clearly met.

In showing disparate impact, the "proper comparison is between the racial composition of those occupying the at-issue jobs and the composition of the 'otherwise-qualified applicants' for those positions." *Sanchez,* 928 F. Supp. at 1500 (citations omitted); see also *Carter v. CB Richard*

*Ellis, Inc.*, 122 Cal. App. 4th 1313 (2004) (applying *Ward's Cove Packing v. Antonio*, 490 U.S. 642, 650 (1989) and *Rose* to a FEHA claim). In *Sanchez*, a challenge to a written examination for the Sergeant position within the Santa Ana Police Department, the City and the plaintiff both used "the 144 Santa Ana police officers who took the written examination as the actual pool of applicants for purposes of statistical analysis."

In determining adverse impact, the Ninth Circuit analyzes whether "the statistical disparity is 'substantial' or 'significant' in a given case." *Lady v. County of Los Angeles*, 770 F.2d 1421, 1428 (9th Cir.1985), *cert. denied*, 475 U.S. 1109 (1986). To determine whether a disparity is "substantial," courts often look to the so-called "80% rule" for guidance. See EEOC Uniform Guidelines on Employee Selection Procedures ("Uniform Guidelines"), 29 C.F.R. Part 1607 (1984). Normally, a selection device is considered to have a substantial adverse impact if it has a "selection rate for any [protected group] which is less than four-fifths (or eighty percent) of the rate of the group with the highest rate. . . " Id., § 1607.4(D).

Here, the group of "otherwise-qualified" officers are those officers who were eligible and would have been "reachable"[9] on the Q-35 List, as of each date that appointments were made to investigative positions in 2007-2009. (See Everett Harry's Age Discrimination Analysis Report ("Harry Report"), at 9-10, Exhibit 12 to Sorgen Dec.). Inclusion of such officers from the Q-35 List is appropriate because the appointments could and should have been made from that list; then-Assistant Chief Tabak testified that the Q-35 eligibles were clearly qualified to do the work assigned to the officers appointed in 2007, 2008 and 2009, and that there was no reason that they could not have been appointed. (Tabak Depo., at 49:19-51:1). Indeed, the City had appointed from the Q-35 List from its adoption through 2006 for these very positions, and has since resumed appointing from the new Q-35 List which is not comprised entirely of officers over the age of forty. Thus, the City must concede that the Q-35 List was still active (as the CSC formally determined in 2008, see Ex. 4 to the Sorgen Dec.), and that the Q-35 eligibles were "otherwise qualified" for the

_____

[9]"Reachable" with respect to the Q-35 List refers to those officers who could have been promoted if the positions had been filled from the Q-35 List (*i.e.*, those officers who were within the 84-Point selection band as of a particular appointment date). (See Stipulation and Order re: Q-35 Selection Procedures, Ex. 11 to the Sorgen Dec.).

challenged appointments. No new examination had been administered at the time the Q-50s were appointed to investigative positions in 2007 and 2008, and no new eligible lists had been approved prior to the 2009 appointments. Regarding the recent 2009 appointments to Investigative Teams at district stations, Tabak stated that those Sergeants perform the "same job" that Inspectors have traditionally performed at the Bureau. (Tabak Depo., at 49:19-51:1). Tabak also testified that the best way to tell whether an officer would be able quickly to learn the skills required to become an effective Inspector was by his or her rank on the Q-35 exam, which tested Investigative Knowledge, Skills and Attributes ("KSAs"). (Tabak Depo., at 32:25-37:20).

The selection rate on a given date represents the ratio of two percentages. The first percentage is the number of individuals who were at least 40 years of age and appointed to an investigative position as a percentage of all qualified and reachable individuals who were at least 40 years of age. The second percentage is computed by the same method, except for using list counts of individuals less than 40 years of age. (Harry Report, at 13-16). Using these rates, Plaintiffs' expert, Everett Harry, evaluated the appointment and selection rates by age group for the Q-35 List as used for 2000-2006, the Q-50 List as used for 2007-2009, and the Q-35 List if used for 2007-2009 "but for" its abandonment by CCSF. Mr. Harry's analysis, summarized in Chart #6 of his Report, at p. 15, shows that "CCSF's abandonment of the Q-35 List after 2006 and use of the Q-50 List from 2007-2009 caused a drastic decrease in the selection rate of older qualified officers to investigative positions from a rate of 1.37 times down to only .69 times the selection rate of younger reachable officers." This rate is, of course, far below the 80% threshold that traditionally constitutes a "substantial disparate impact" under the Uniform Guidelines. (Harry Report, at 15-16).

Moreover, using the Chi-square method, Mr. Harry compared: 1) the actual distribution by age group of investigative appointments for 2007-2009 from the Q-50 List; with 2) a "but for" distribution by age group had CCSF continued to make appointments to these investigative positions from the Q-35 List. Mr. Harry performed the test using several different benchmarks (see Harry Report, at 16-23). Two are critical:

   **Using Q-35 "but for" reachable individuals for 2007-2009 as the benchmark**—According to Mr. Harry, "this is the most pertinent benchmark for

statistically testing the age group proportions of the actual 2007-2009 investigative appointments. If CCSF had not abandoned the Q-35 list. . . , CCSF would necessarily have continued to fill the challenged positions by appointing. . . from the Q-35 list. Had it done so, the resultant appointments would have included far higher counts of older individuals than occurred by CCSF's improper use of the Q-50 list. . . A Chi-square test confirms this observation by demonstrating that there was a . . . far less than .1% chance that random events alone could explain the relative disparity between the older and younger age groups for the actual, disputed Q-50 appointments during 2007-2009 compared to the 'but for' appointments."

**Using Q-35 plus Q-50 reachable[10] individuals during 2007-2009 as the benchmark**—As a potential analytical alternative only, Mr. Harry also developed a benchmark for the expected 2007-2009 age group distribution based upon a hypothetical combined reachable pool of "but for" Q-35 candidates and Q-50 individuals. Although this analytical alternative is inconsistent with the CSC's ruling that the subject Q-50 individuals were working out of class, Mr. Harry nevertheless found that "a Chi-square statistical test still indicates less than a .1% chance that random events might explain the disproportionately high rate of appointment of younger individuals during 2007-2009 to investigative positions compared to an expected outcome based upon the hypothetical Q-35 and Q-50 combined pool of reachable individuals."

(Harry Report, at 17 and at 19-20).

Thus, regardless of the statistical method used, it is clear that the City's practice of using only the Q-50 List to make appointments to investigative positions to perform work traditionally performed by Q-35 Assistant Inspectors has resulted in the appointment to challenged positions of qualified officers aged forty and over at a drastically lower rate than the rate of appointment of qualified officers under the age of forty. This difference in appointment rates has resulted in a substantial adverse impact on the putative class: officers over forty who were on the Q-35 List and who could have received an investigative promotion in 2007-2009 had those promotions been made from the Q-35 List.

It is clear from both then-Assistant Deputy Chief Tabak's testimony and the CSC Statement of Decision that those officers on the Q-35 List were qualified for the 2007-2009 investigative appointments. (Tabak Depo at 49:19-51:1; see also ex. 4 to the Sorgen Dec., at 2-4). Indeed, the funds for the 2007 appointments were intended for 0380/Q-35 positions, but were later "TX'ed"[11] to pay for the Q-50 Sergeants appointed to investigative positions to work out of class. While

---

[10]Whether an officer on the Q-50 List was "reachable" is determined using the "Rule of Five Scores," San Francisco Civil Service Rule 213.3.

[11] "TX" or Temporary Exchange refers to a process by which funds originally intended for one classification are used to fund a different classification.

officers could have been appointed from the Q-35 List for all of the challenged appointments in this action, then-Chiefs Fong and Gascon affirmatively decided *not* to appoint from that list, and instead to appoint the much younger officers on the Q-50 List, despite the fact that those Q-50 eligibles had never been tested on the KSAs required for the investigative positions which were the basis of the Q-35 examination.

The City's employment practice of appointing officers exclusively from the ranks of the Q-50 List for assignment to work traditionally performed by Assistant Inspectors, while refusing to promote the older, more qualified officers on the Q-35 List, had a substantial adverse impact on the proposed class members.

## IV.    Class Representatives

The proposed class representatives, Terrye Ivy, Jacklyn Jehl, Mike Lewis, Vince Neeson, and Juanita Stockwell,[12] were all eligible for promotion from the Q-35 List, and were thus qualified for promotion as of the date of the earliest challenged promotions, on August 25, 2007. All class representatives were over forty years of age on the date of the first discriminatory promotions, and could have been reachable for promotion if the appointments challenged here had been properly made from the Q-35 List. Plaintiffs are aware of no conflict or other reason why they will not fairly and adequately represent the interests of the class; the Court agreed with Plaintiffs in its Order re: the previous Motion for Class Certification. (Order, at 17:25-18:6).

## V.    Argument for Class Certification

### A.    The Proposed Class

The proposed class includes all officers who were on the Q-35 List and were aged forty or above as of the three dates of the 2007- 2009 challenged appointments, and could have been appointed to such investigative positions had the City made those appointments from the Q-35 List.

Plaintiffs further propose three subclasses, one for each of the three distinct appointment dates; *i.e.*, (1) a separate subclass for all of those who could have been appointed in September 2007; (2) all who could have been appointed in 2008 if the thirty-five 2007 appointments had been

---

[12]As the Court noted in its Order, Juanita Stockwell's representation is limited to claims in connection with the 2009 appointments only. (Order, at 18:5-6).

1    made from the Q-35 List; and (3) all officers who could have been appointed in 2009 had the thirty-
2    seven 2007 and 2008 investigative appointments been made from the Q-35 List. Some class
3    members will be members of more than one subclass.

### B.    Legal Standard for Class Certification

5        Under Rule 23(a), the party seeking class certification must establish: (1) that the class is
6    so large that joinder of all members is impracticable (*i.e.*, numerosity); (2) that there are one or more
7    questions of law or fact common to the class (*i.e.*, commonality); (3) that the named parties' claims
8    are typical of the class (*i.e.*, typicality); and (4) that the class representatives will fairly and
9    adequately protect the interests of other members of the class (*i.e.*, adequacy of representation).
10   Fed. R. Civ. P. 23(a). In addition to satisfying these prerequisites, parties seeking class certification
11   must show that the action is maintainable under Rule 23(b)(1), (2) or (3). Plaintiffs seek
12   certification under Rule 23(b)(3), which permits certification when "questions of law or fact
13   common to class members predominate over any questions affecting only individual members, and
14   that a class action is superior to other available methods for fairly and efficiently adjudicating the
15   controversy." See Rule 23(b); *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 614 (1997). The
16   party seeking class certification bears the burden of establishing that the requirements of Rules
17   23(a) and 23(b) have been met. See *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1188 (9th
18   Cir. 2001), *amended by* 273 F.3d 1266 (9th Cir. 2001); *Hanon v. Dataproducts Corp.*, 976 F.2d
19   497, 508 (9th Cir. 1992). However, in adjudicating a motion for class certification, the court
20   accepts the allegations in the complaint as true so long as those allegations are sufficiently specific
21   to permit an informed assessment as to whether the requirements of Rule 23 have been satisfied.
22   See *Blackie v. Barrack*, 524 F.2d 891, 901 n.17 (9th Cir. 1975), *cert. denied*, 429 U.S. 816 (1976).
23   The merits of the class members' substantive claims are generally irrelevant to this inquiry. *Eisen*
24   *v. Carlisle & Jacquelin*, 417 U.S. 156, 177–78 (1974); *Moore v. Hughes Helicopters, Inc.*, 708 F.2d
25   475, 480 (9th Cir. 1983).

26
27
28

### C.    Rule 23(a) Requirements

For the reasons discussed at page 5, n.9, *supra*, Plaintiffs address only the "commonality" and "predominance" requirements, as to which this Court previously found that Plaintiffs' showing was deficient.

### 1.    The Standard for Demonstrating "Commonality"

To fulfill the commonality prerequisite of Rule 23(a)(2), Plaintiffs must establish that there are questions of law or fact common to the class as a whole.  Rule 23(a)(2) does not mandate that each member of the class be identically situated, only that there be substantial questions of law or fact common to all.  See *Harris v. Palm Spring Alpine Estates, Inc*., 329 F.2d 909, 914 (9th Cir. 1964).  "Rule 23(a)(2) has been construed permissively. All questions of fact and law need not be common to satisfy the rule.  The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class."  *Hanlon v. Chrysler Corp*., 150 F.3d 1011, 1019 (9th Cir. 1998).

The commonality requirement can be satisfied "by presenting statistical evidence, which survives a 'rigorous analysis,' sufficient to fairly raise a common question concerning whether there is class-wide discrimination."  *Dukes v. Wal-Mart Stores, Inc.,* 603 F.3d 571, 604 (9th Cir. 2010), *cert. granted in part by* 131 S. Ct. 795 (U.S. Dec. 6, 2010) (citations omitted).

### 2.    Plaintiffs' Showing.

Here, all putative class members were on the Q-35 List and qualified for appointment to investigative positions.  Furthermore, it is possible that each putative class member could have been among those selected for an investigative position in 2007, 2008 or 2009 had the City made the appointments from the Q-35 List instead of making discriminatory appointments from the Q-50 List.

The common question of fact shared by all putative class members is whether the City's employment practice of appointing Sergeants exclusively from the Q-50 List to investigative positions traditionally performed by Assistant Inspectors and refusing to make any of the appointments from the active Q-35 List, had a disparate impact on qualified applicants for the investigative positions who were aged forty or above at the time of those appointments, in violation

of FEHA. Thus, all members of the putative class suffered the same substantial adverse impact based on their age.

In its prior Order denying class certification, the Court identified three major areas in which it found Plaintiffs' showing as to the "commonality" requirement under Rule 23(a) to be deficient: (1) the methodology used by Plaintiffs' expert, Everett Harry; (2) the correctness of the "comparison pools" used by Plaintiff to show disparate impact based on age; and (3) the failure of Mr. Harry's analysis "to adequately account for and explain away any alternative variable that could interfere with any inference of discrimination." (Order, at 13:4-6). Plaintiffs will address each of these in turn.

        **a.**    **Plaintiffs' Expert's Revised Report Is Clear and Detailed, Eliminates the Issues Concerning Methodology Raised by the Court's Order, and Is Rooted in Well-Accepted Analytical Methodology and Supported By Authoritative Citations.**

In the previous Order denying Plaintiffs class certificaion, the Court criticized the original Analysis Report of Everett Harry submitted by Plaintiffs in support of their original Motion for Class Certification on the grounds that it was not "root[ed] in any well-accepted analytical methodology," and that its methodology was "not supported by any references to authoritative citation." (Order, at 11:24-27). The revised Harry Report submitted in support of this Renewed Motion, however, contains none of these deficiencies. In connection with this Motion, Mr. Harry has streamlined and clarified the material in his previous Report in order to respond to all of the issues raised both by the Court and by the Defendant. Charts have been labeled and explained, arguably extraneous material has been eliminated, and definitions of key terms have been clarified. For example, pages 14-17 of that Report contain detailed analyses of the assumptions underlying Mr. Harry's use of the Chi-square test, and Section X contains new citations to authorities relating to appropriateness of the use of that test to evaluate disparate impact discrimination claims. Section XI contains a new discussion of why Mr. Harry concluded that a regression analysis, suggested by the City, would not be an appropriate statistical method to use given the facts of this case, and Section XII contains a new and more detailed explanation of the statistical assumptions and premises used by Mr. Harry.

**b. Plaintiffs Have Used the Correct Comparison Pools, and Mr. Harry's Revised Report Reflects That and Explains All of the Preliminary Comparisons He Did In Order to Reach His Conclusions.**

The Order suggested that it was "difficult clearly to decipher the comparison pools used by plaintiffs. (Id., at 12:18). Whatever confusion was raised in the Court's mind about other possible comparisons that were performed should now be allayed by a review of the new Harry Report, which explains clearly all of the different comparisons he did in order to reach his ultimate conclusions concerning the selection rates: Chart #2 shows how he calculated the average ages of reachable officers on each list as of each appointment date between 2007 and 2009; Chart #3 shows average ages by appointment date for the Q-35 List "but for" officers (who otherwise would have be appointed from the Q-35 List) compared to Q-50 List actual investigative appointments; Chart #4 shows total reachable officers for investigative positions by relevant appointment date and age range; Chart #5 shows total investigative appointments by relevant appointment date range and age group; and finally, Chart #6 shows the appointment and selection rates by age group for the Q-35 List as used for 2000-2006, the Q-50 List as used for 2007-2009, and the Q-35 List if used for 2007-2009 "but for" its abandonment by CCSF. Mr. Harry reaches the same conclusion using all of the alternative comparison pools: the City's practice disparately impacted the putative class.

**c. Why the Use of a Regression Analysis Is Neither Required Nor Appropriate in this Case.**

The Court's final criticism of Mr. Harry's original analysis was that it failed "to adequately account for and explain away any alternative variables that could interfere with any inference of discrimination." As Defendant noted, examples of potential variables in this case include: examination scores, job performance, seniority, experience and/or education of the various officers on the Q-35 eligibility list. . ." (Order, at 13:4-6). In making this point, the Court relied on *Dukes v. Wal-Mart Stores, Inc., supra,* a case involving Title VII claims by female employees of nationwide retail store chain seeking injunctive and declaratory relief, back pay, and punitive damages. Plaintiffs certified a class of all female Wal-Mart employees, asserting that women were discriminated against throughout the corporation, nation-wide, in all job classifications. In *Dukes,* the Court found that Plaintiffs' expert's "regressions show that gender is a statistically significant

variable in accounting for the salary differentials between female class members and male employees at Wal-Mart stores." Id. at 607.

There are several reasons why the holding in *Dukes* is not dispositive in this case. First, *Dukes* does not hold that regression analyses are *required* in all Title VII disparate impact cases; it merely stands for the fact that whatever statistical methods is used "to estimate the extent to which a particular independent variable" (in that case, gender; in this case, age) "has influenced the dependent variable[s]" (in that case, compensation and promotion; in this case, promotion to an investigative position), it should include enough "relevant, non-discriminatory independent variables" to indicate whether disparities are actually attributable to the independent variable.

Next, it is understandable that the *Dukes* Court would require regressions using multiple independent variables in a case involving potentially more than a million plaintiffs competing for promotions presumably based their employer's assessment of various such "independent variables" such as education, seniority, and job experience, in contrast to the civil-service promotional system at issue here, which creates ranked lists of persons already deemed be "otherwise qualified" for the positions they are seeking, and which prescribes statutory guidance as to the order in which promotions are to be made.

Moreover, in this case, however, unlike in *Dukes*, there is simply no suggestion that *any other independent variable(s) needed to be made part of Mr. Harry's analysis, because the City has never presented any evidence that it regularly and systematically utilized any independent factor(s) other than rank on a particular list as a basis for appointments to investigative positions.* As the Ninth Circuit held in *Hemmings v. Tidyman's Inc.,* 285 F.3d 1174 (9th Cir. 2002), a defendant's attack on a plaintiff's statistical evidence of discrimination on the ground that it failed to perform regressions using other independent variables

> may not rest an attack on an "unsubstantiated assertion of error." [*Equal Employment Opportunity Comm'n v.*] *Gen. Tel. Co.* [*of Northwest, Inc.,*] 885 F.2d [575,] at 580 [(9th Cir. 1989)], [*cert. denied,* 498 U.S. 950 (1990)]. Rather, the defendant must "produce credible evidence that curing the alleged flaws would also cure the statistical disparity." Id. at 583. *Accord Sobel v. Yeshiva Univ.,* 839 F.2d 18, 34 (2d Cir.1988) ("[A] defendant challenging the validity of a multiple regression analysis [must] make a showing that the factors it

contends ought to have been included would weaken the showing of a salary disparity made by the analysis).[13]

*Hemmings,* 285 F.3d at 1188. Here, the City has neither identified any independent variables that it claimed were used in making investigative appointments in 2007-2009, nor has it made any showing that the inclusion of such independent variables would weaken or eliminate the showing of age discrimination made by Mr. Harry's analysis. *Accord Adams v. Ameritech Services, Inc.* (7th Cir., 2000) 231 F.3d 414, 425 ("we are not prepared to hold as a matter of law that nothing but regression analyses can produce evidence that passes the *Daubert* and *Kumho Tire* thresholds. Statisticians might have good reasons to look at data in different ways").

This case is in fact, far more similar to *Allen v. Seidman,* 881 F.2d 375 (7th Cir. 1989), than it is to *Dukes.* In *Allen,* the plaintiffs were representatives of a class of African-American bank examiners who failed the "Program Evaluation" test that their employer formerly used as an aid in determining whether to promote bank examiners at pay level GS-9 to the rank of "commissioned bank examiner" (GS-11). Only 39% of the African-American candidates who took the exam passed, as opposed to 84% of the Caucasian candidates. The district court concluded after a bench trial that the test had a disparate impact and had not been shown to be a business necessity, and therefore entered judgment for the class. Id. at 378.

On appeal, defendants asserted that the statistical test used by plaintiffs was "simplistic because it has only one independent variable: race." The *Allen* court first acknowledged that

> [o]ther variables, such as education, can of course affect performance on a test, and there is a well-known statistical technique, multiple-regression analysis, for estimating the partial effect of one of several independent variables on the dependent variable (here, success on the Program Evaluation test). . . It is possible that if success on the . . . test had been regressed on other variables as well as race, race would have been found to have no effect,

---

[13]In this case, the Second Circuit addressed the use of regression analyses to prove a claim of gender-based wage discrimination at a medical school. The court rejected the school's contention that the plaintiff had omitted important variables that would explain the disparity in salary which the plaintiffs' experts had attributed to gender discrimination. Id. at 34. The court found that the university had simply criticized the plaintiff's failure to include certain variables without offering any reason for concluding that they correlated with sex and affected the result, and held that a defendant challenging the validity of a multiple regression analysis must show that the factors it contends should have been included would weaken the salary disparity demonstrated by the plaintiff's analysis.

or a statistically insignificant effect, on success; and then there would have been no proof of disparate impact.

Id. (citation omitted). However, the court ultimately concluded that such a multiple-regression analysis was unnecessary because the two groups being compared – African-American bank examiners and Caucasian bank examiners – were not "obviously and substantially different in some relevant aspect," but instead were a group that was already known to have essentially identical qualifications for the position being tested for:

> In order to be eligible to take the . . . test, you must have been a GS-9 bank examiner for at least a year. Examiners are hired years before reaching GS-9 and several grades lower (GS-4 or GS-5), with the result that the test takers will have been working as bank examiners . . . for anywhere between five and fifteen years and will have demonstrated sufficient competence to earn several promotions. Any, or at least many, educational deficiencies that individual examiners had when hired are likely to have been washed out by on-the-job training and experience..

Id. at 379. Rejecting defendant's attack on the plaintiffs' statistical case as tantamount to "a contention that unless a plaintiff eliminates all alternative hypotheses he must lose," the court concluded that:

> [i]n a case like this, where the pool taking the challenged test is reasonably homogeneous in terms of qualifications and the racial disparity in results is very large, a simple statistical comparison will support a finding that the test had a disparate impact. *See Aguilera v. Cook County Police & Corrections Merit Board, supra,* 760 F.2d [844,] at 846 [(7th Cir. 1985)], and cases cited there." ***This is especially true in the present case since the defendant, while taking pot shots-none fatal-at the plaintiffs' statistical comparison, did not bother to conduct its own regression analysis, which for all we know would have confirmed and strengthened the plaintiffs' simpler study.***

Id. at 380 (emphasis supplied).

Here, Mr. Harry's analyses were perfectly adequate under the reasoning of *Allen*: Defendant has pointed at no way in which the persons in the comparison pools were "obviously and substantially different in some relevant aspect," and all had been deemed "qualified" by Defendant for appointment to investigative positions. Moreover, Defendant did not conduct its own regression analysis to rebut Plaintiffs' statistical data.

Another factor that this Court should have considered in deciding whether plaintiff's expert should have run regressions including other independent variables is the information Defendant provided to Plaintiffs. In *Hemmings*, the Ninth Circuit noted:

> the plaintiffs' expert "used the best available data, which [came] from the [defendant] itself." *Adams v. Ameritech Serv. Inc.,* 231 F.3d 414, 424 (7th Cir. 2000). If the defendant

believed information about the employees' educational background, for example, would have explained the differences in promotions and compensation between male and female upper level employees, Tidyman's should have provided information about educational level to the plaintiffs, or at a minimum, introduced testimony that education was a central factor in promotions.

Id. at 1188-89. In this case, CCSF provided Plaintiffs only with limited information about the subject people, such as name, birth date, Q-35/50 test score and rank, Q-35/50/60 appointment date, retirement date, or death date. It did *not* provide Plaintiffs with information about any other potential independent variables that it claims to have used in making the promotional decisions at issue and that would therefore make a regression analysis appropriate, such as educational level, job performance ratings, and so forth. Nor has it presented any evidence that any other such factors were actually used on a systematic basis.

Finally, as Mr. Harry explains in his revised Report, there are other reasons peculiar to this case made a multifactor regression analysis inappropriate here:

> Even assuming for theoretical purposes that sufficient data and information were available to perform one or more regression analyses, however, such exercises would not be appropriate, relevant or useful given the facts of this case. I discuss below alternative regression scenarios and explain why each is not appropriate or meaningful considering the facts of this case.
>
> 1. **Q-35 reachable v. appointed individuals for 2000-2006**: Plaintiffs do not allege age discrimination during this period of time. Regardless, I observe that individuals were not appointed strictly in rank order by appointment date. A hypothetical regression analysis might identify factors helping to explain why at times some lower ranked individuals were appointed before higher ranked individuals. This observed fact is not an issue for the plaintiffs because by 2006, virtually all reachable and otherwise available Q-35 list individuals were in fact appointed as Q-35s regardless of age or any other factor. By August 2006, according to information produced by CCSF, all but three of the Q-35 list ranks 1 through 288 were appointed as Q-35s or otherwise accounted for through Q-50/60 appointment, retirement or death. (See **Exhibit 3.L.3**) In short, the order of appointment from the Q-35 list is not challenged by plaintiffs and need not be evaluated by regression analysis.
>
> 2. **Q-50 reachable v. appointed investigators for 2007-2009**: According to defendant's statistical expert, the subject 2007-2009 appointments essentially were made in Q-50 list rank order regardless of any other factors, including age.[14] Thus, there is no need to evaluate any *other* factors, since the disputed appointments from the Q-50 list primarily resulted from appointed individual's relative rank/test score therein.

---

[14] Declaration of Christopher Haan, Ph.D., in Support of Defendant City and County of San Francisco's Opposition to Motion for Class Certification dated June 16, 2010 ("Haan Dec."), page 7, states, for example, that 51 regular and investigative appointments were made on August 25, 2007, which excluded Jonas at rank 1 but included all 51 people from rank 2 to rank 34 (there were multiple listings or "ties" for certain ranks on the Q-50 List).

3. **Q-35 "but for" appointments v. actual Q-50 appointments for 2007-2009**: Again, plaintiffs' allegation of age discrimination is that they were entirely excluded from appointment consideration during 2007-2009, and not appointed at all when CCSF abandoned the Q-35 list. Any hypothetical regression is inappropriate and not relevant for many reasons, including:

- CCSF's CSC has already determined that the Q-35 list remained active for 2007-2009, despite its having been set aside or abandoned by CCSF. Further, CCSF already has determined that the appointments from the Q-50 list for assistant inspector equivalents were improper. A regression analysis might be relevant assuming sufficient information were available to perform the statistical exercise and if the CCSF change to the Q-50 eligible list for 2007-2009 had been a proper transition, perhaps as a contemporaneous business necessity. Even assuming that this hypothetical regression suggested that Q-50 appointed individuals were relatively more qualified than "but for" Q-35 list individuals during 2007-2009, however, such a regression analysis cannot change the facts that CCSF's CSC had already determined its list change was improper, the Q-35 eligible individuals were qualified for the disputed appointments, and the Q-50 job classification description did not encompass the work traditionally performed by the Q-35s.[15]

- The obvious correlation (a perfect correlation at that) is between whether a disputed appointment was made or not and whether an individual appeared on the Q-50 list or the Q-35 list, respectively. The facts and disclosed information do not reveal that Q-35s were individually excluded from consideration based upon any contemporaneous CCSF objective or subjective assessment of such Q-35 individuals' relative qualifications compared to available Q-50s for the period of 2007-2009. The fact that not even one Q-35 "but for" reachable individual received a direct Q-35 appointment during 2007-2009 underscores the harshness of the CCSF decision of 100% abandonment of the Q-35 list.

- CCSF also contends that the Q-50 list used for 2007-2009 was comprised of individuals with unique job experience and training that reachable individuals appearing on the Q-35 list lacked. If CCSF can now manufacture such a variable, and associate it only with those individuals reachable or appointed as investigators from the Q-50 list, then the outcome of this hypothetical regression analysis would be self-serving and simply mirror CCSF's alleged premise. The hypothetical correlation would of course be perfect, since CCSF would have defined every appointed Q-50 as possessing the needed attribute and every (since none were actually appointed) "but for" reachable individual as lacking the attribute. First, CCSF's CSC contradicted this viewpoint by ruling that the "but for" reachable Q-35s during 2007-2009 were "qualified" to be appointed to the investigative positions at issue. Second, if the disputed Q-50 appointed individuals actually did possess some unique qualification that became necessary for job performance beginning no later than 2007, the trier of fact can evaluate this CCSF argument and any supporting evidence as a CCSF "business necessity" argument without the need for any contrived regression analysis. A regression analysis might have been appropriate if CCSF had even nominally pooled the Q-35 and Q-50 lists from 2007-2009, however, it made selections exclusively from the Q-50 list.

---

[15] CCSF Civil Service Commission, "Q-35/Q-50 Statement of Decision", adopted February 2, 2009. Exhibit 8 to the Harry Report.

(Id. at pp. 24-27)(citations in original omitted).

For all of the foregoing reasons, Plaintiffs respectfully suggest that a multiple-regression analysis using other independent variables was unnecessary to demonstrate "commonality" under Rule 23(a)(2).

## VI.    Predominance and Superiority Under Rule 23(b)(3)

In addition to meeting the conditions imposed by Rule 23(a), a party seeking certification of a class under Rule 23(b)(3) also bears the burden of establishing that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Predominance "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation, . . . a standard far more demanding than the commonality requirement of Rule 23(a)." *Dukes, supra,* 603 F.3d at 593. The Court previously found that Plaintiffs failed to provide the Court with a foundation to undertake a predominance analysis, and that due to the individual disparate treatment claims and claims of plaintiffs not a part of the previously proposed class, class treatment was not superior. (Order, at 19:7-9).

### A. **Predominance**

This case is ideally suited for class adjudication because the issue of liability turns on a single predominant factual finding: whether the City's practice of appointing officers to investigative positions exclusively from the Q-50 List instead of the Q-35 List had a disparate impact on the older officers on the Q-35 List who were otherwise qualified and who could have been reachable for appointment had the City used the Q-35 List. Plaintiffs' expert has concluded that there was such a disparate impact using multiple statistical analyses. (Harry Report, at 12-27). Utilizing both the "80% Rule" and a Chi-square analysis, the challenged practice had a disparate impact on the officers on the Q-35 List, who were overwhelmingly older than the officers on the Q-50 List. (See id.). The ultimate question in this case is not whether an individual plaintiff would have received one of the challenged positions, but whether the putative class members, *as a group of officers over the age of forty who otherwise could have been appointed*, suffered a disparate

impact based on age due to CCSF's employment practice. A number of other common questions predominate.

Plaintiffs' expert concluded that there was a disparate impact on all officers remaining on the Q-35 List above rank 421 who had not been promoted to Q-50 or Q-60, retired, died, or otherwise left the SFPD by the 2009 appointment date, because these officers could have received an appointment had CCSF properly used the Q-35 List. (Harry Report, at 39). Even if the trier of fact concludes that a different rank is the cut-off point for the officers who suffered the disparate impact, no individualized inquiry is required. A putative class member is either above that cut-off, could have been reachable and is a member of the class, or is below that cut-off and not a member of the class. The ranks and scores on the Q-35 List have been static and unchanged since the list was created in 1998. The only determinative factor that is related to whether an officer was selected for an investigative appointment is his or her rank and score on an eligibility list. (Harry Report, at 23-27).

Plaintiffs and the putative class members were qualified for the investigative positions by virtue of their being included on the Q-35 eligibility list. (Tabak Depo. at 49:19-51:1; Ex. 4 to Sorgen Dec. at 2-4). If an officer was within the 84-point band, he or she was reachable for promotion. (Ex. 11 to Sorgen Dec.).

Plaintiffs assert, and Defendant admits, that the officer with the highest remaining score was "unpromotable," and that such an officer's presence such could not prevent the band from moving, in effect precluding every other officer on the list from ever being promoted. (Haan Dec., at 3; Harry Report, at 28-29, 34-35). Thus, the 84-point band necessarily would have moved had CCSF properly made the appointments from the Q-35 List, a common question affecting whether each member of the class was or would have been "reachable" due to their individual ranks on the Q-35 List.

CCSF's change in employment practice from appointing officers from the Q-35 List to instead exclusively utilizing the Q-50 List was not a business necessity, as they could have utilized the following less-discriminatory alternatives: (a) made the appointments from the active Q-35 List as they had since its inception (Ex. 4 to Sorgen Dec.); (b) amended the Q-50 class specification

prior to the appointments and conducted an examination so that selections from the Q-50 List would not have been working out of class (which is precisely what the CSC ordered them to do, see id.); or (c) conducted a new Q-35 examination and appointed officers from that list (which CCSF has also since done) (see Ex. 2 to the Stockwell Dec.).

Since each of the fifty-five (55) investigative appointments challenged here had a disparate impact on the older officers on the Q-35 List, the members of the class should be entitled to a share of the aggregate value of those fifty-five investigative positions. Even if the trier of fact ultimately determines that fewer positions were at issue, that determination necessarily will affect all putative class members. The resolution of each of these common questions will affect all of the Plaintiffs, and in fact will be determinative of CCSF's liability to each and every plaintiff and putative class member.

## B. Superiority

Here, because of the technically subjective nature of the selection process, it would be impossible for any individual class member to absolutely guarantee that he or she would have received a promotion had the appointments been made from the Q-35 List. The Court cannot go back in time and make subjective determinations about what would or should have happened nearly three years ago. A class action is not simply the superior method for those injured to seek relief, it is the *only* way relief can effectively be provided to all those adversely impacted by the City's employment practice. Moreover, the issues with which the Court was concerned regarding manageability are no longer present.

The Court noted a number of manageability problems pursuant to Rule 23(b)(3) in its Order, and concluded that "allowing this action to go forward as a class action is not necessarily the superior method in this case, since the court already is facing a trial as to multiple claims and parties on some of the very same issues that plaintiffs seek to certify." (Order, at 19:25-27). The Court was concerned that the Plaintiffs would still individually litigate their disparate treatment claims, that the ADEA claims would be litigated individually, and that the claims of the plaintiffs who were outside the previously proposed class would also have to be litigated individually. Id. Since the entry of that Order, Plaintiffs have amended their complaint specifically to address the Court's

concerns. Plaintiffs have now narrowed the case to the single issue of whether CCSF's employment practice caused a disparate impact on the putative class members. The Plaintiffs who were outside the proposed class have dismissed their claims. All disparate treatment claims have been dismissed. Plaintiffs are concurrently seeking conditional certification of an ADEA class (see Section IX, infra). Plaintiffs have streamlined this case in direct response to the Court's manageability concerns, which are no longer present.

Once the trier of fact has made a determination regarding disparate impact with respect to the class, that determination will be binding on all other claims of all of the Plaintiffs and putative class members. Similarly, the defenses available to the City are applicable and identical with respect to all claims. Here, class adjudication would promote judicial economy and would prevent duplicative litigation of identical issues for each individual plaintiff.

Rule 23(b)(3)(A) advises the Court to consider "the class members' interests in individually controlling the prosecution or defense of separate actions." Here, even if there were separate actions to prosecute each Plaintiff's claims, the same evidence and the defenses would be repeated in each and every separate case. One cannot demonstrate a disparate impact on a single person, but only on a group.

Rule 23(b)(3)(B) states that another factor pertinent to a finding of predominance is "the extent and nature of any litigation concerning the controversy already begun by or against class members." Plaintiffs are unaware of any other litigation which raises claims that the City's practice of appointing Q-50 Sergeants to investigative positions to do work traditionally performed by Q-35 Assistant Inspectors has a disparate impact on qualified applicants aged forty and up. There is one other case which challenges the same employment practice being challenged here, *Amigo, et al. v. Civil Service Commission et al.,* San Francisco Superior Ct. Case No. 09-509716. However, *Amigo* does not include claims of age discrimination.

In considering "the desirability or undesirability of concentrating the litigation of the claims in [this] particular forum," Plaintiffs note that all of the conduct relevant to Plaintiffs' claims took place in this forum, and that any other forum would be undesirable for this case. (See Rule 23(b)(3)(C)).

## VII. Notification of Class Members Under Rule 23(c)(2)(B)

If the Court finds that Plaintiffs have satisfied the requirements of Rule 23(b)(3) and certifies the class, Rule 23(c)(2)(B) requires the Court to direct notice to the class members that includes the following information concerning: the nature of the action; the definition of the class certified; the class claims, issues, or defenses; that a class member may enter an appearance through an attorney if the member so desires; that the court will exclude from the class any member who requests exclusion; the time and manner for requesting exclusion; and the binding effect of a class judgment on members under Rule 23(c)(3). If the Court conditionally certifies the ADEA claim, the notice will also include an explanation of the ADEA claim and instructions regarding "opting in" to that class (see Section IX, *infra*).

In the event the Court grants this Motion, Plaintiffs propose that if the Court does not draft the notice, the parties work together to draft and stipulate to such a notice within two weeks of the Court's order certifying the putative class.

## VIII. Motion for Appointment of Class Counsel Under Rule 23(g)

The Court previously found that since there were "no objections to the adequacy of class counsel, this adequacy prong is satisfied." (Order, at 17:6-7; see counsel declarations filed herewith).

## IX. Conditional Certification of a Collective Action on the ADEA Claim is Appropriate.

The class action format under the ADEA is not guided by Rule 23. Instead, the ADEA, incorporates the standards of § 16(b) of the Fair Labor Standards Act ("FLSA") (29 U.S.C. § 216(b)), and expressly authorizes employees to bring collective age discrimination actions "in behalf of themselves and other employees similarly situated." *Hoffman-La Roche v. Sperling,* 493 U.S. 165, 170 (1989) (quoting § 216(b)); see also *Kimel v. Florida Bd. of Regents,* 528 U.S. 62, 74 (2000). In contrast to Rule 23, which contains an "opt-out" provision, the FLSA contains an "opt-in" provision that prohibits any employee from being "a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought." 29 U.S.C. § 216(b). The relevant statutes and case law do not prescribe clear rules for determining whether putative class members are similarly situated. "In

general, however, courts appear to require nothing more than substantial allegations that the putative class members were together the victims of a single decision, policy, or plan infected by discrimination." *Sperling v. Hoffman-LaRoche, Inc.,* 118 F.R.D. 392, 407 (D.N.J.), *aff'd in part on other grounds and appeal dismissed in part on other grounds,* 862 F.2d 439 (3d Cir.1988), *aff'd and remanded on other grounds,* 493 U.S. 165 (1989).  Under the lower standard of §216(b), Plaintiffs have clearly alleged that they were all victims of the same decision, plan, and policy:  the CCSF's decision to appoint officers to investigative positions exclusively from the Q-50 List, instead of utilizing the Q-35 List which consisted of the Plaintiffs and other qualified officers over the age of forty. Conditional certification of a collective action for notice purposes of Plaintiffs' ADEA claims is appropriate.

## X.  CONCLUSION

The City's practice of promoting Sergeants from the Q-50 List and assigning them to investigative positions had a disparate impact on the putative class, officers aged forty and above who could have received a promotion had the City made the investigative appointments from the Q-35 List.  All of the requirements of Rule 23(a) and 23(b) are satisfied.  For the foregoing reasons, Plaintiffs' motion for class certification should be granted.

Dated: June 1, 2011          By:    _____/s/_____
                                          Michael S. Sorgen
                                          LAW OFFICES OF MICHAEL S. SORGEN
                                          Attorneys for Plaintiffs

Dated: June 1, 2011          By:    _____/s/_____
                                          Richard A. Hoyer
                                          HOYER & ASSOCIATES
                                          Attorneys for Plaintiffs