United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JUANITA STOCKWELL, et al.,

        Plaintiffs,

        v.

CITY AND COUNTY OF SAN
FRANCISCO, et al.,

        Defendants.

_____/

No. C 08-5180 PJH

**ORDER DENYING RENEWED MOTION
FOR CLASS CERTIFICATION**

      Before the court is plaintiffs' renewed motion for class certification.  The court held a hearing on plaintiffs' motion on October 22, 2014.  Plaintiffs Juanita Stockwell, Jacklyn Jehl, Terrye Ivy, Michael Lewis, and Vince Nesson, on behalf of the putative class, and 25 other named plaintiffs (collectively, "plaintiffs") appeared through their counsel, Richard Hoyer, Ryan Hicks, and Michael Sorgen.  Defendant City and County of San Francisco ("defendant" or "the City") appeared through its counsel, Jonathan Rolnick.

      Having read the parties' papers, including their supplemental briefs, and carefully considered their arguments and the relevant legal authority, and good cause appearing, the court DENIES plaintiffs' renewed motion for class certification as follows.

## BACKGROUND

      This case arises out of allegations of age discrimination in employment.  Plaintiffs bring this action on behalf of a putative class of similarly situated individuals who worked for the San Francisco Police Department ("SFPD") and who were allegedly denied advancement opportunities because of their age.

      The operative second amended class action complaint ("SAC") alleges that each of

United States District Court

For the Northern District of California

1  the plaintiffs is a SFPD officer with extensive investigative experience, and who took and

2  passed the test for a Q-35 Assistant Inspector position.  SAC, ¶ 12.  Traditionally, the City

3  had filled its investigative positions by promoting officers from the Q-35 list.  Id., ¶ 18.

4  However, starting in 2007, the City began assigning investigative duties to newly-promoted

5  Sergeants who had taken the Q-50 exam, rather than to Assistant Inspectors promoted

6  from the Q-35 list.  Plaintiffs allege that the practice of filling investigative positions from the

7  Q-50 list had a substantial adverse impact on officers over the age of forty.  Id., ¶ 22.

8       As a result of the Q-50 hiring practice, plaintiffs filed this suit, seeking to represent

9  "themselves individually and all similarly-situated officers over 40 years old against whom

10  [the City] has discriminated on the basis of age by implementing its policy and practice of

11  promoting officers exclusively from the Q-50 list for investigative positions traditionally held

12  by Q-35 Inspectors in lieu of the older qualified officers on the Q-35 list."  SAC, ¶ 23.

13       Throughout this case, plaintiffs have asserted two causes of action: one under

14  California's Fair Employment and Housing Act ("FEHA"), and one under the federal Age

15  Discrimination in Employment Act ("ADEA").  In the operative SAC, the FEHA claim is

16  asserted by five named representative plaintiffs on behalf of a putative class, whereas the

17  ADEA claim is asserted by those same five plaintiffs in their individual capacities, as well as

18  by 25 additional individual plaintiffs.  Plaintiffs now seek class certification with respect to

19  their FEHA claim, but do not seek certification of a class or collective action under the

20  ADEA.

21       Plaintiffs have sought class certification on their FEHA claim twice before.  The court

22  denied the first attempt in August 2010 on multiple grounds.  First, with regard to the Rule

23  23(a) factors, it found that the numerosity, typicality, and adequacy prongs were met, but

24  that plaintiffs' expert report, which purported to provide statistical evidence of disparate

25  impact based on age, suffered from deficiencies that precluded a finding of commonality.

26

27

28

See Dkt. 75 at 11-14.  Second, with regard to the Rule 23(b)(3) factors[1], the court found that plaintiffs had "not provided the court with an opportunity to make any determinations" regarding predominance, as their papers did "not undertake any sort of demonstration regarding the existence of any common questions of law or fact that predominate over individual issues."  Id. at 18-19.  Thus, the court held that it had "no foundation upon which to undertake a predominance analysis," which, standing alone, warranted denial of plaintiffs' motion.  However, the court still addressed the "superiority" prong of Rule 23(b)(3), and found that "even certification of a class under FEHA would still leave the court with thirty-nine . . . individual ADEA claims to adjudicate," and thus, "certification hardly streamlines the issues to be litigated at trial."  Id. at 19.

After denial of the first class certification motion, plaintiffs sought leave to file an amended complaint, and filed a second motion for class certification.  Among other things, the second motion included a revised expert report that attempted to address the concerns noted by the court in its previous denial of class certification.  After considering the revised expert report, the court again found that the evidence failed to show that the City's practice of making investigative promotions from the Q-50 list had a disparate impact on certain employees because of their age.  See Dkt. 117 at 11-12.  Even though that issue went to the merits, the court read the Supreme Court's then-recent decision in Wal-Mart Stores v. Dukes to require such an inquiry into the merits as part of the "commonality" analysis, and thus denied plaintiffs' second motion for lack of commonality.  The court further held that it "need not reach the question of whether plaintiffs have satisfied the requirements of FRCP 23(b)(3)."  Id. at 12.

Plaintiffs appealed the court's denial of the second motion for class certification, and the Ninth Circuit reversed.  749 F.3d 1107 (9th Cir. 2014).  While the Ninth Circuit took no position on whether "the statistical showing the officers have made" was "adequate to make

_____

[1]The court noted in its order that, although the complaint purported to seek class action status under both Rule 23(b)(2) and Rule 23(b)(3), the motion for class certification was brought only under Rule 23(b)(3).  See Dkt. 75 at 5, n.2.

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1    out their merits case," it held that any such question went "to the merits of this case, or to

2    the predominance question," but did not affect the commonality analysis.  Id. at 1116.

3    Instead, the commonality prong was met simply because "the officers are all challenging a

4    single policy they contend has adversely affected them," and "[t]he question whether the

5    policy has an impermissible disparate impact on the basis of age necessarily has a single

6    answer."  Id.  The Ninth Circuit then held that the arguments regarding "predominance"

7    were inadequately briefed by the parties, and that such questions would be "best

8    addressed by the district court" on remand.  Id. at 1117.

9        Plaintiffs have now filed a third motion for class certification, referred to in this order

10    as the "renewed motion for class certification."  Plaintiffs seek certification of a FEHA-only

11    class under Rule 23(b)(3), and do not seek certification of a class or a collective action with

12    regard to their ADEA claims.

13        In their motion, plaintiffs raised an issue for which the court requested clarification at

14    the hearing.  Plaintiffs acknowledged (in a footnote) that "[t]here are 133 potential class

15    members, but the City made only 55 appointments between 2007 and 2009 to positions

16    that did the investigative work that had previously been done by the Q-35s."  See Dkt. 134

17    at 15, n.9.  In other words, even if the City had never undertaken the allegedly-

18    discriminatory hiring practice (i.e., making promotions to investigative positions from the

19    Q-50 list), only 55 individuals from the Q-35 list could have been promoted.

20        At the hearing, plaintiffs' counsel made two alternative arguments.  First, they

21    argued that the damages from the 55 "but-for" promotions should be aggregated and

22    divided pro rata among the 133 putative class members.  However, plaintiffs' counsel also

23    offered a "fallback position," in which the court would certify a class of only 55 individuals.

24    Plaintiffs argued that, if the City had continued to make promotions from the Q-35 list, it

25    would have filled the 55 positions by promoting the 55 highest-ranked officers on the list.

26    Thus, the court could certify a class of 55 and avoid any overbreadth issues that might

27    doom a class of 133.

28        Because the "class of 55" proposal was not fully addressed in the parties' briefs, the

4

United States District Court

For the Northern District of California

1   court ordered supplemental briefing on the issue.  The court also requested clarification on

2   how plaintiffs intended to proceed on their ADEA claims if a FEHA class were to be

3   certified.  As mentioned above, in denying plaintiffs' first class certification motion, the court

4   found that the presence of individual ADEA claims would affect the "superiority" analysis

5   under Rule 23(b)(3).  To those ends, the court directed the parties to address the following

6   three issues in supplemental briefing:  (1) whether defendant had a practice of making

7   promotions in rank order, or whether it took into account secondary criteria or other

8   individualized characteristics, and how defendant's practice affected the "predominance"

9   analysis; (2) which of the named plaintiffs, and which of the class representatives, are

10  included among the top-ranked 55 individuals on the Q-35 list; and (3) how plaintiffs intend

11  to proceed on their ADEA claims, given that they sought certification only on their FEHA

12  claims.  See Dkt. 142 at 2-3.

**DISCUSSION**

13  A.    Legal Standard

15       "Before certifying a class, the trial court must conduct a 'rigorous analysis' to

16  determine whether the party seeking certification has met the prerequisites of [Federal Rule

17  of Civil Procedure] 23."  Mazza v. American Honda Motor Co., Inc., 666 F.3d 581, 588 (9th

18  Cir. 2012) (citation and quotation omitted).  The party seeking class certification must

19  affirmatively demonstrate that the class meets the requirements of Rule 23.  Wal-Mart

20  Stores, Inc. v. Dukes, __ U.S. __, 131 S.Ct. 2541, 2551 (2011); see also Gen'l Tel. Co. of

21  Southwest v. Falcon, 457 U.S. 147, 156 (1982).  Thus, in order for a plaintiff class to be

22  certified, the plaintiff must prove that he/she meets the requirements of Federal Rule of

23  Civil Procedure 23(a) and (b).  As a threshold matter, and apart from the explicit

24  requirements of Rule 23, the party seeking class certification must also demonstrate that

25  an identifiable and ascertainable class exists.  Mazur v. eBay Inc., 257 F.R.D. 563, 567

26  (N.D. Cal. 2009).

27       Rule 23(a) requires that plaintiffs demonstrate numerosity, commonality, typicality

28  and adequacy of representation in order to maintain a class.  Mazza, 666 F.3d at 588.

1  That is, the class must be so numerous that joinder of all members individually is

2  "impracticable;" there must be questions of law or fact common to the class; the claims or

3  defenses of the class representative must be typical of the claims or defenses of the class;

4  and the class representative must be able to protect fairly and adequately the interests of

5  all members of the class.  See Fed. R. Civ. P. 23(a)(1)-(4).

6      If the class is ascertainable and all four prerequisites of Rule 23(a) are satisfied, the

7  court must also find that the plaintiff has "satisf[ied] through evidentiary proof" at least one

8  of the three subsections of Rule 23(b).  Comcast Corp. v. Behrend, 133 S.Ct. 1426, 1432

9  (2013).  A class may be certified under Rule 23(b)(1) upon a showing that there is a risk of

10  substantial prejudice or inconsistent adjudications from separate actions.  Fed. R. Civ. P.

11  23(b)(1).  A class may be certified under Rule 23(b)(2) if "the party opposing the class has

12  acted or refused to act on grounds that apply generally to the class, so that final injunctive

13  relief or corresponding declaratory relief is appropriate respecting the class as a whole."

14  Fed. R. Civ. P. 23(b)(2).  Finally, a class may be certified under Rule 23(b)(3) if a court

15  finds that "questions of law or fact common to class members predominate over any

16  questions affecting only individual members, and that a class action is superior to other

17  available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P.

18  23(b)(3).

19      "[A] court's class-certification analysis . . . may 'entail some overlap with the merits of

20  the plaintiff's underlying claim.'"  Amgen Inc. v. Conn. Ret. Plans and Trust Funds, 133

21  S.Ct. 1184, 1194 (2013) (quoting Dukes, 131 S.Ct. at 2551).  Nevertheless, "Rule 23 grants

22  courts no license to engage in free-ranging merits inquiries at the certification stage."  Id. at

23  1194-95.  "Merits questions may be considered to the extent – but only to the extent – that

24  they are relevant to determining whether the Rule 23 prerequisites for class certification are

25  satisfied."  Id. at 1195.  If a court concludes that the moving party has met its burden of

26  proof, then the court has broad discretion to certify the class.  Zinzer v. Accuflix Res. Inst.,

27  Inc., 253 F.3d 1180, 1186, amended by 273 F.3d 1266 (9th Cir. 2001).

28

United States District Court

For the Northern District of California

B.    Legal Analysis

As mentioned above, plaintiffs are pursuing two alternative theories of the class – one that includes 133 putative class members, and a "fallback position" that includes only 55 putative class members (made up of the 55 highest-ranked individuals remaining on the Q-35 list).  The court will analyze the Rule 23(a) factors under both scenarios.

1.    Rule 23(a)

Plaintiffs must first show that they have satisfied the requirements for class certification under Rule 23(a), which requires establishing the following four elements: numerosity, commonality, typicality, and adequacy.

a.    Numerosity

Rule 23(a)(1) requires that a class be so numerous that joinder of all members is impracticable.  In order to satisfy this requirement, plaintiffs need not state the "exact" number of potential class members, nor is there a specific number that is required.  See In re Rubber Chems. Antitrust Litig., 232 F.R.D. 346, 350-51 (N.D. Cal. 2005).  Rather, the specific facts of each case must be examined.  In re Beer Distrib. Antitrust Litig., 188 F.R.D. at 561 (citing General Tel. Co. v. EEOC, 446 U.S. 318, 330 (1980)).  While the ultimate issue in evaluating this factor is whether the class is too large to make joinder practicable, courts generally find that the numerosity factor is satisfied if the class comprises 40 or more members, and will find that it has not been satisfied when the class comprises 21 or fewer.  See, e.g., Consolidated Rail Corp. v. Town of Hyde Park, 47 F.3d 473, 483 (2d Cir. 1995); Ansari v. New York Univ., 179 F.R.D. 112, 114 (S.D.N.Y. 1998).

In ruling on plaintiffs' original motion for class certification, the court previously found that the proposed class of 133 did meet the numerosity requirement, and now finds that even the alternative class of 55 would meet the numerosity requirement.  The court also notes that defendant does not dispute that plaintiffs have shown that the class is sufficiently numerous.

b.    Commonality

Rule 23(a)(2) requires "questions of law or fact common to the class."  This

7

United States District Court

For the Northern District of California

1    provision requires plaintiffs to "demonstrate that the class members 'have suffered the

2    same injury,'" not merely violations of  "the same provision of law."  Dukes, 131 S.Ct. at

3    2551 (internal citation omitted).  Accordingly, plaintiffs' claims "must depend upon a

4    common contention" such that "determination of [their] truth or falsity will resolve an issue

5    that is central to the validity of each one of the claims in one stroke."  Id.  "What matters to

6    class certification . . . is not the raising of common 'questions' – even in droves – but, rather

7    the capacity of a classwide proceeding to generate common answers apt to drive the

8    resolution of the litigation."  Id. (internal citation omitted).

9         Plaintiffs need not show, however, that "every question in the case, or even a

10   preponderance of questions, is capable of class wide resolution.  So long as there is 'even

11   a single common question,' a would-be class can satisfy the commonality requirement of

12   Rule 23(a)(2)."  Wang v. Chinese Daily News, Inc., 737 F.3d 538, 544 (9th Cir. 2013)

13   (quoting Dukes, 131 S.Ct. at 2556); see also Mazza, 666 F.3d at 589 ("commonality only

14   requires a single significant question of law or fact").  Thus, "[w]here the circumstances of

15   each particular class member vary but retain a common core of factual or legal issues with

16   the rest of the class, commonality exists."  Evon v. Law Offices of Sidney Mickell, 688 F.3d

17   1015, 1029 (9th Cir. 2012) (citations and quotations omitted).

18        As mentioned above, the Ninth Circuit has held that plaintiffs "have identified a

19   single, well-enunciated, uniform policy that, allegedly, generated all the disparate impact of

20   which they complain: the SFPD's decision to make investigative assignments using the

21   Q-50 List instead of the Q-35 List," and that "[t]he question of whether the policy has an

22   impermissible disparate impact on the basis of age necessarily has a single answer."  749

23   F.3d at 1114, 1116.  The Ninth Circuit described this as a "significant common question,"

24   and even though it acknowledged that individual questions may well predominate over the

25   common one, that issue affected only predominance, and had "no effect on commonality,

26   because there is a single, logically prior, common question: whether the cancellation of the

27   Q-35 List generated a disparate impact on older officers."  Id. at 1117.

28        The Ninth Circuit's holding applies with equal force regardless of whether a class of

8

1    133 or a class of 55 is analyzed.  Accordingly, the court finds that plaintiffs have shown that

2    the commonality requirement is met.

3                    c.    Typicality

4         The third requirement under Rule 23(a) is that the claims or defenses of the class

5    representatives must be typical of the claims or defenses of the class.  Fed. R. Civ. P.

6    23(a)(3).  Typicality exists if the named plaintiffs' claims are "reasonably coextensive" with

7    those of absent class members.  Staton v. Boeing, 327 F.3d 938, 957 (9th Cir. 2003).  To

8    be considered typical for purposes of class certification, the named plaintiff need not have

9    suffered an identical wrong.  Id.  Rather, the class representative must be part of the class

10   and possess the same interest and suffer the same injury as the class members.  See

11   Falcon, 457 U.S. at 156.

12        "The purpose of the typicality requirement is to assure that the interest of the named

13   representative aligns with the interests of the class."  Hanon v. Dataproducts Corp., 976

14   F.2d 497, 508 (9th Cir. 1992) (citation omitted).  According to the Ninth Circuit, "[t]ypicality

15   refers to the nature of the claim or defense of the class representative, and not to the

16   specific facts from which it arose or the relief sought."  Id. (quotation omitted).  "The test of

17   typicality is whether other members have the same or similar injury, whether the action is

18   based on conduct which is not unique to the named plaintiffs, and whether other class

19   members have been injured by the same course of conduct."  Id. (internal quotation marks

20   omitted); see also Armstrong v. Davis, 275 F.3d 849, 868 (9th Cir. 2001) (typicality is

21   satisfied when each class member's claim arises from the same course of events, and

22   each class member makes similar legal arguments to prove the defendant's liability);

23   Lightbourn v. County of El Paso, 118 F.3d 421, 426 (5th Cir. 1997) (typicality focuses on

24   the similarity between the named plaintiffs' legal and remedial theories and the legal and

25   remedial theories of those whom they purport to represent).  In practice, the commonality

26   and typicality requirements of Rule 23 "tend to merge."  Gen'l Tel. Co. Of Southwest, 457

27   U.S. at 158 n. 13.  The Ninth Circuit interprets the typicality requirement permissively.

28   Hanlon v. Chrysler Corp., 150 F.3d 1011, 1020 (9th Cir. 1998).

United States District Court

For the Northern District of California

1    The court previously found that the class representatives would have claims and

2   defenses typical of a class of 133, and reaches the same conclusion here.  With respect to

3   a class of 55, plaintiffs' counsel has represented to the court[2] that all five class

4   representatives fall within the top 55 of the full list of 133, making their claims typical even if

5   the class is limited to 55.

6           d.    Adequacy

7    The fourth requirement under Rule 23(a) is adequacy of representation.  The court

8   must find that named plaintiffs' counsel is adequate, and that named plaintiffs can fairly and

9   adequately protect the interests of the class.  To satisfy constitutional due process

10  concerns, unnamed class members must be afforded adequate representation before entry

11  of a judgment which binds them.  See Hanlon, 150 F.3d at 1020.  Legal adequacy is

12  determined by resolution of two questions: (1) whether named plaintiffs and their counsel

13  have any conflicts with class members; and (2) whether named plaintiffs and their counsel

14  will prosecute the action vigorously on behalf of the class.  Id.  Generally, representation

15  will be found to be adequate when the attorneys representing the class are qualified and

16  competent, and the class representatives are not disqualified by interests antagonistic to

17  the remainder of the class.  Lerwill v. Inflight Motion Pictures, 582 F.2d 507, 512 (9th Cir.

18  1978).

19   The court has previously found that plaintiffs had sufficiently demonstrated adequacy

20  with regard to a class of 133.  And based on the same representation discussed earlier (in

21  the context of typicality), the court similarly finds that the class representatives would fairly

22  _____

23      [2]See Dkt. 141.  In this letter, plaintiffs' counsel states that a "review of Exhibit 3.L.3 [to
    the report of Everett Harry, which is attached to the declaration of Michael Sorgen] reveals that
24  in fact all five class representatives are among the 55 highest ranked remaining individuals on
    the Q35 list."  However, exhibit 3.L.3 provides a list of 452 individuals (not 133), of which
25  plaintiff Stockwell is ranked 289, plaintiff Jehl is ranked 235, plaintiff Ivy is ranked 306, plaintiff
    Lewis is ranked 357, and plaintiff Nesson is ranked 294.  See Dkt. 107-10 at 201-209.
26  Plaintiffs never set forth any methodology for narrowing the list of 452 down to 133, which
    would presumably result in the five class representatives falling within the top 55 of those 133.
27  Regardless, for the purposes of this motion, the court will assume that plaintiffs' counsel is
    correct, and that the five class representatives do indeed fall within the top 55 of the 133
28  putative class members.

10

**United States District Court**
For the Northern District of California

and adequately represent a class of 55.

      2.    Rule 23(b)

      To start, plaintiffs' motion makes clear that they seek certification under Rule 23(b)(3).  See Dkt. 134 at 9.  Rule 23(b)(3) requires plaintiffs to establish that questions of law or fact common to the class predominate, and that a class action is superior to other methods available for adjudicating the controversy at issue.  See Fed. R. Civ. P. 23(b)(3).

      a.    Predominance

      The requirement that questions of law or fact common to class members predominate over questions affecting only individual members "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 623 (1997).  This inquiry requires the weighing of the common questions in the case against the individualized questions, which differs from the Rule 23(a)(2) inquiry as to whether the plaintiff can show the existence of a common question of law or fact.  See Dukes, 131 S.Ct. at 2556.

      In addition, however, Rule 23(b)(3) requires a more stringent analysis than does Rule 23(a)(2).  See Comcast, 133 S.Ct. at 1432.  Rule 23(a)(2) simply requires a "common contention" that is "capable of classwide resolution" and "will resolve an issue that is central to the validity of each one of the claims in one stroke." Amchem, 521 U.S. at 624; see also Comcast, 133 S.Ct. at 1432; Dukes, 131 S.Ct. at 2545, 2551.  By contrast, to satisfy the Rule 23(b)(3) predominance inquiry, it is not enough to establish that common questions of law or fact exist, as it is under Rule 23(a)(2)'s commonality requirement.  Indeed, the analysis under Rule 23(b)(3) "presumes that the existence of common issues of fact or law have been established pursuant to Rule 23(a)(2)." Hanlon, 150 F.3d at 1022.  Rule 23(b)(3) focuses on the "relationship between the common and individual issues." Id. Under the predominance inquiry, "there is clear justification for handling the dispute on a representative rather than an individual basis" if "common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication . . . ." Id., quoted in Mazza, 666 F.3d at 589.  An essential part of the

United States District Court

For the Northern District of California

1   predominance test is whether "adjudication of common issues will help achieve judicial

2   economy."  In re Wells Fargo Home Loan Mortg. Overtime Pay Litig., 571 F.3d 953, 958

3   (9th Cir. 2009) (citations and quotations omitted).

4          Thus, to satisfy this requirement, plaintiffs must show both (1) that the existence of

5   individual injury arising from the defendant's alleged actions (i.e., the defendant's liability to

6   each class member) is "capable of proof at trial through evidence . . . common to the class

7   rather than individual to its members" and (2) that "the damages resulting from that injury

8   [are] measurable 'on a class-wide basis' through the use of a 'common methodology.'"

9   Comcast, 133 S.Ct. at 1430 (citation omitted).

10          As mentioned above, the Ninth Circuit did not reach the issue of "predominance,"

11   instead finding that such questions "are best addressed by the district court, which is in the

12   best position to consider the most fair and efficient procedure for conducting any given

13   litigation."  749 F.3d at 1117.  The Ninth Circuit acknowledged that a number of issues

14   identified by defendant may well show that individual issues predominate over common

15   ones – "including: (a) whether an officer took the 2006 Sergeants exam or not, (b)

16   comparisons of individual rank on and between the 1998 Assistant Inspector list and the

17   2007 Sergeant list, (c) the relative qualifications of each officer on the list, and (d) other

18   factors affecting an assignment to the Investigations Bureau."  Id. at 1116-17.

19          At the hearing on this motion, the court expressed concern that individual issues

20   would predominate over common ones for a class of 133, because there were only 55

21   investigative positions filled during the class period, and the court would necessarily need

22   to consider the individual qualifications of each class member to determine which of the 55

23   would have been promoted if the City had made promotions from the Q-35 list (rather than

24   from the Q-50 list).  Plaintiffs' counsel responded to that concern by emphasizing what they

25   call their "fallback position," that the court could certify a class of the 55 class members

26   who were highest ranked on the Q-35 list, arguing that the City would have made

27   promotions strictly in rank order from that list, eliminating the need for individualized

28   inquiries into the officers' qualifications.  The court construed plaintiffs' counsel's

1   statements as a concession that only a class of 55 could meet the "predominance"

2   requirement, and ordered supplemental briefing on the "predominance" issue in a written

3   order issued on the same day that the hearing was held:

> At the hearing, plaintiffs' counsel made a number of concessions regarding the nature of the class for which certification is sought. Specifically, plaintiffs clarified that they were now pursuing a theory originally described as their "fallback position," that only 55 of the 133 putative class members had suffered any injury, as any promotions from the Q-35 list would have been made in rank order. Thus, plaintiffs conceded that the only class that could be certified, based on the current state of the evidence, is one limited to the 55 top-ranked individuals on the Q-35 list. Plaintiffs further conceded that only one of the five class representatives is among those 55 top-ranked individuals[3], and only "two or three" of the other 25 named plaintiffs are among the 55 top-ranked individuals. In so doing, plaintiffs also conceded that any plaintiffs who did not fall within the top 55 would not have a valid claim under either California's Fair Employment and Housing Act ("FEHA") or under the Age Discrimination in Employment Act ("ADEA"), and further conceded that any class representatives who fall outside the top 55 would not have claims that are typical of the class and would not adequately represent the class.

13   Dkt. 142 at 1-2.

14   Plaintiffs now vigorously dispute that they made any concession regarding the

15   proposed class of 133, and emphasize that they are still primarily seeking certification of a

16   class of 133 individuals, and alternatively seek certification of a class of 55 "only if the court

17   finds that the City would have made promotions in 2007-2009 in rank order from the Q-35

18   list had it not instead made promotions to investigative positions exclusively from the Q-50

19   list." Dkt. 145 at 1. Given this clarification, the court will first address the "predominance"

20   issue as applied to the proposed class of 133, and will then address the "fallback" position

21   of a class of 55.

22   In their supplemental brief, plaintiffs acknowledge that "individual issues concerning

23   whether or not a particular individual would or would not have received one of the 'but for'

24   promotions" could be a potential barrier to class certification under Rule 23(b)(3), but offer

25   a proposal for avoiding that obstacle. Specifically, plaintiffs propose certifying a liability-

_____

27   [3]After the hearing, plaintiffs' counsel filed the letter, referred to above in footnote 2, indicating that all five class representatives are among the 55 top-ranked individuals on the Q-35 list.

1   only class of 133, using the discretion granted to this court by Rule 23(c)(4).  Rule 23(c)(4)

2   provides that "[w]hen appropriate, an action may be brought or maintained as a class action

3   with respect to particular issues."  Plaintiffs urge the court to use that rule's authority to

4   bifurcate the liability portion of the case from the damages portion, arguing that the liability

5   phase "involves no case-by-case evaluation of why each of the putative class members

6   might have been removed from consideration for promotion off of the Q-35 list," and thus,

7   ensures that individualized damages issues do not predominate over the common issues.

8       For support, plaintiffs primarily rely on Houser v. Pritzker, in which a Southern

9   District of New York court certified a class for liability purposes, but not for damages

10  purposes.  28 F.Supp.3d 222 (S.D.N.Y. 2014).  The Houser plaintiffs were applicants for

11  work with the U.S. Census Bureau who had been removed from consideration based on

12  criminal background checks, which they alleged were discriminatory.  The court found that

13  the Rule 23(a) factors were met, and found that a liability-only class could be certified under

14  Rule 23(b)(2).  However, analyzing the proposed damages subclass under Rule 23(b)(3),

15  the Houser court found problems with the "predominance" requirement.

16      The Houser court first cited to the relevant Supreme Court precedent in Comcast v.

17  Behrend, in which the Court "concluded that individual questions of entitlement to damages

18  would predominate over common questions at the remedial stage of the litigation," because

19  the plaintiffs' damages model did not distinguish the class members who were entitled to

20  damages from those who were not.  28 F.Supp.3d at 251 (citing Comcast, 133 S.Ct. at

21  1435).  The Houser court then applied Comcast to the case before it, finding that "the

22  plaintiffs' proposed damages model does not survive scrutiny under Comcast," as it was

23  "vastly overinclusive, and doubtlessly includes individuals who are not entitled to backpay

24  under the proposed theory of liability because they would not have been hired even absent

25  the alleged discrimination."  28 F.Supp.3d at 253.  The Houser court further held that, "as in

26  Comcast, the plaintiffs' pro rata model makes no attempt whatsoever to separate those

27  class members who are entitled to damages from those who are not."  Id.  The court

28  concluded that "[i]ndividual issues regarding each class member's entitlement to damages

14

United States District Court

For the Northern District of California

1   thus necessarily will predominate at the remedial stage," so "the plaintiffs' proposed

2   damages subclasses cannot be certified under Rule 23(b)(3)."  Id.

3           As pointed out by the plaintiffs in this case, the Houser court then exercised its

4   discretion under Rule 23(c)(4), and found that "certifying the plaintiffs' proposed liability and

5   injunctive relief class will materially advance the litigation and make the proceedings more

6   manageable."  28 F.Supp.3d at 254.  However, plaintiffs bury an important point in a

7   footnote of their supplemental brief, acknowledging that "[t]he only difference is that this

8   would be a liability-only class under 23(b)(3), rather than a liability and injunctive relief class

9   under 23(b)(2)."  Dkt. 145 at 10, n.7.  Even if this were the "only difference," it is a

10  significant one.

11          Under Rule 23(b)(2), plaintiffs seeking class certification need only demonstrate that

12  "the party opposing the class has acted or refused to act on grounds that apply generally to

13  the class."  Plaintiffs seeking certification under Rule 23(b)(3) are subject to a completely

14  different set of requirements, and must show that "questions of law or fact common to class

15  members predominate over any questions affecting only individual members, and that a

16  class action is superior to other available methods for fairly and efficiently adjudicating the

17  controversy."

18          The Houser court expressly found that a damages class "cannot be certified under

19  Rule 23(b)(3)" based on the teachings of Comcast, and certified a liability-only class only

20  because the plaintiffs moved for such a class under Rule 23(b)(2).  In contrast, plaintiffs in

21  this case have made clear that they "seek certification under Rule 23(b)(3)," and nowhere

22  in their papers do they invoke Rule 23(b)(2) as a basis for their motion.  See Dkt. 134 at 9;

23  see also Dkt. 135 (proposed order granting class certification under Rule 23(b)(3)); Dkt.

24  145 at 13 (supplemental brief requesting that the court "certify a liability-only class of 133

25  individuals under Rule 23(b)(3)").

26          Overall, the court finds that the same problems that were present in Houser are

27  present in this case.  As in Houser, the proposed class "doubtlessly includes individuals

28  who are not entitled to backpay under the proposed theory of liability because they would

15

United States District Court

For the Northern District of California

not have been hired even absent the alleged discrimination."  In fact, the proposed class would contain 78 members who are not entitled to any backpay, because plaintiffs admit that only 55 of the 133 proposed class members would have been promoted in the "but-for" scenario.  In other words, the majority of the class would be made up of individuals with no claim for relief.  And unlike in <u>Houser</u>, the plaintiffs in this case do not seek certification of a liability-only class under Rule 23(b)(2).  The court declines to grant liability-only certification to a damages-only class.  For those reasons, the court rejects plaintiff's proposed class of 133 individuals, and denies plaintiff's motion for class certification to the extent that it seeks such relief.

The court is now left with plaintiffs' "fallback position," certification of a class of the 55 highest-ranked individuals remaining on the Q-35 list.  Under this theory, the City would have filled the 55 investigative positions strictly in rank order from the Q-35 list, without considering the individual qualifications of each officer.  Thus, according to plaintiffs, the "class of 55" theory avoids the predominance problems that plagued the "class of 133," because the court would not need to inquire into the individual merits of each Q-35 officer, and as a result, individual questions would not predominate over common ones.

However, if the court is to grant certification under the "class of 55" theory, it must first consider the merits of such a theory.  While this court has no authority to "engage in free-ranging merits inquiries at the certification stage," the merits "may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied."  <u>Amgen</u>, 133 S.Ct. at 1194-95 (internal citations omitted).  In order to show that common issues predominate over individual ones, in the context of a class of 55, the court must first determine whether the 55 proposed class members actually suffered a common injury – that is, whether each of them would have been promoted but-for the City's allegedly discriminatory policy.

As mentioned above, the court noted at the hearing that the parties had not adequately addressed the issue of "predominance" in the context of a class of 55, and ordered supplemental briefing on the issue.  Later that same day, the court issued an order

16

United States District Court

For the Northern District of California

specifying the issues to be addressed in the supplemental briefing, including the following:

> The parties must fully address the issue of whether defendant had a practice of making promotions in rank order, or whether it took into account secondary criteria or other individualized characteristics.  Specifically, the parties must present evidence, or specifically identify evidence of record, regarding the promotion of Sergeants from the Q-50 list, and the promotion of Assistant Inspectors from the Q-35 list (during the time when defendant still made promotions from that list).  And as discussed at the hearing, plaintiffs must support their expert's opinion that promotions were made in rank order by directly comparing the ranked Q-50 list with the list of officers who were ultimately promoted, and similarly, by directly comparing the ranked Q-35 list with the list of officers who were ultimately promoted.  The parties must also present their arguments regarding how this evidence affects the "predominance" analysis.

Dkt. 142 at 2-3.

In their opening supplemental brief, plaintiffs clarify their position regarding the methodology used by the City to make promotions.  While plaintiffs maintain that "the City clearly had a practice of making Q-50 promotions in essentially chronological 'rank order' during the disputed period," they no longer argue that the City made Q-35 promotions in the same manner.  Instead, plaintiffs admit that "the most that can be said about the City's practice under the current state of the evidence is that an individual in the first 233 individuals on the [Q-35] list had a 95.7%[4] chance of eventually receiving an appointment sometime during the period when the City promoted officers from that list between 2000 and 2006."  Dkt. 145 at 4.

Plaintiffs' use of the word "eventually" is significant.  They concede that the City "did not make the 2000-2006 Q-35 promotions strictly in chronological rank order," but argue that, over time, each officer within a certain range on the Q-35 list would have eventually received a promotion.  See Dkt. 145 at 5, 11.  In other words, plaintiffs no longer contend that the Q-35 evidence supports the conclusion that the 55 highest-ranked Q-35 officers would have been promoted to the 55 investigative positions that were filled during the class

---

[4]The City challenges this figure, arguing that it is skewed by the fact that 110 of the Q-35 promotions were made pursuant to a court order in a previous case.  See Dkt. 146 at 11.  Plaintiffs did not respond to this argument in their supplemental reply.  Because plaintiffs' evidence is insufficient even if the 95.7% number is accepted, the court need not determine whether plaintiffs' figure is accurate.

United States District Court

For the Northern District of California

1   period.  Instead, at best, the Q-35 evidence suggests only that most of the 55 highest-

2   ranked individuals would have <u>eventually</u> received a promotion.  Thus, the court is in the

3   same position that it was with respect to the proposed class of 133 – if the Q-35 "but-for"

4   promotions would have been made in something other than rank order, then an inquiry into

5   the individual qualifications of each Q-35 officer would be necessary in order to determine

6   exactly which officers would have received the promotions.

7        Further, plaintiffs provide no basis for determining the size of the "band" from which

8   the 55 promotions would have been made.  Based on the state of the evidence, the court

9   has no way to determine whether the 55 "but-for" promotions would have been made from

10  the highest-ranked 60 officers, the highest-ranked 90 officers, the highest-ranked 110

11  officers, or from the full list of 133 officers that has already been rejected as a proposed

12  class.

13       Plaintiffs attempt to save their "class of 55" theory by arguing that, even though the

14  City did not make Q-35 promotions in rank order, "the court may still conclude that the City

15  would have made the 55 'but-for' promotions in rank order, based on its practice with

16  respect to the 2007-2009 promotions off the Q-50 list."  However, the court finds two

17  problems with this argument.  First, plaintiffs' "but-for" scenario is premised on the idea that

18  the City would have continued to make promotions from the Q-35 list, making the City's

19  Q-35 promotion history far more relevant than its Q-50 promotion history.  Plaintiffs have

20  not provided any basis for their contention that the City's Q-35 promotions would have been

21  made according to the City's Q-50 practice.  Instead, it appears that plaintiffs emphasize

22  the Q-50 data for the sole reason that it is favorable to their "predominance" argument.

23       Second, even if the court were to find the Q-50 promotion data relevant to the Q-35

24  "but-for" promotions, the data still does not support plaintiffs' argument that the City would

25  have made Q-35 promotions strictly according to rank.  To be sure, the Q-50 data provides

26  much more support to plaintiffs' "rank order" argument than does the Q-35 data, as 84.6%

27  of the officers available for a Q-50 promotion actually received such a promotion.  <u>See</u> Dkt.

28  145-2 at 8 (citing data showing that 55 out of 65 officers received a Q-50 promotion to an

18

United States District Court

For the Northern District of California

1   investigative position).  Plaintiffs thus argue that "it was more likely than not that a Q-50

2   investigative appointment would have been made on a rank order basis."  Id.  However, the

3   City points out that ten officers on the Q-50 list were entirely skipped over for a promotion,

4   indicating that "an individual's rank alone on the Q-50 list is not sufficient to determine

5   whether the individual would have been next in line to be appointed," and that "[t]he reason

6   why these [ten] individuals were 'skipped' and not appointed must be attributed to

7   something other than rank."  See Dkt. 146-3, ¶¶ 33-34.  Thus, while the evidence shows

8   that having a high rank on the Q-50 list was certainly a prerequisite to a promotion, it was

9   by no means sufficient, by itself, to secure such a promotion.  And while plaintiffs correctly

10  point out that the City's proffered declarations largely consist of conclusory assertions that

11  the City considered secondary criteria, the court need not rely on those declarations,

12  because the hiring data itself shows that the City considered criteria other than rank.

13  Moreover, on this motion, plaintiffs bear the burden of showing that common issues will

14  predominate over individual ones, and with regard to the Q-50 promotions, plaintiffs have

15  not offered any explanation as to what other criteria the City may have taken to account.

16  As a result, the court has no basis on which to find that the City's decision-making process

17  with regard to Q-50 promotions is subject to common evidence, and instead, it appears

18  more likely that individualized evidence would be needed to explain how each of the 55

19  positions were filled.

20      At best, plaintiffs have shown that an individual's rank on the Q-50 list was an

21  indicator of whether that individual was likely to receive a promotion to the rank of sergeant.

22  However, for purposes of this motion, plaintiffs' showing with regard to a "class of 55" falls

23  short in two ways.  First, it still does not account for the City's consideration of individuals'

24  qualifications when making promotion decisions, and thus, does not solve the problem that

25  plagued the "class of 133" proposal – that common issues would not predominate over

26  individual ones.  Second, and more importantly, plaintiffs have not shown how the City's

27  procedure for making Q-50 Sergeant promotions is relevant to its procedure for making

28  "but-for" Q-35 Assistant Inspector promotions.

19

1    To be clear, the court is not troubled by the fact that the class members may have

2  differing amounts of damages.  Defendant points out the fact that some class members

3  have taken the Q-50 exam, and some even received Q-50 promotions, which would limit

4  their recovery in this case.  The court agrees with the approach taken in <u>Chicago Teachers</u>

5  <u>Union, Local 1 v. Board of Education</u>, in which the court found that "the fact that damages

6  may be individualized in this case would not preclude certification," as "[i]t would drive a

7  stake through the heart of the class action device . . . to require that every member of the

8  class have identical damages."  2014 WL 2198449, at *9 (N.D. Ill. May 27, 2014) (internal

9  quotation and citation omitted).

10   However, the court is concerned by the fact that plaintiffs' claims would require

11  individualized proof at trial, rather than proof common to the class.  Again, <u>Chicago</u>

12  <u>Teachers Union</u> provides a relevant comparison.  In that case, a putative class of African-

13  American teachers claimed that the school board's plan to "turn around" ten schools had a

14  racially discriminatory impact.  In denying class certification, the court found that the

15  "predominance" prong was not met, because "there were specific facts and issues as to

16  why each of the ten schools was selected for turnaround," and the "selection process

17  involved a qualitative review," meaning that "the court would need to delve into how each of

18  the ten schools was evaluated in comparison to the other schools considered but not

19  selected."  <u>Id.</u> at *9.  As a result, because "claims would have to be resolved on a school-

20  by-school basis, any efficiencies to be gained by certifying the class under Rule 23(b)(3)

21  are destroyed."  <u>Id.</u>

22   The court finds that reasoning to apply with equal force to the present case.

23  Plaintiffs have failed to meet the first requirement of <u>Comcast</u>, that "the existence of

24  individual injury arising from the defendant's alleged actions (i.e., the defendant's liability to

25  each class member) is "capable of proof at trial through evidence . . . common to the class

26  rather than individual to its members."  Simply put, each member of the class would need

27  to present individualized evidence showing why he or she would have received a Q-35

28  promotion in a "but-for" scenario, and each class member's claim would need to be

United States District Court

For the Northern District of California

1 evaluated on an individualized basis. Plaintiffs have attempted to show that promotions

2 were made strictly in rank order, which would have obviated the need for any individualized

3 analysis, but the evidence does not support their claim. Thus, the court finds that plaintiffs

4 have failed to meet their burden under Rule 23(b)(3) to show predominance of common

5 issues over individual ones.

6                  b.     Superiority

7         Even putting aside the "predominance" issue, plaintiffs' motion suffers from another

8 fatal flaw. As mentioned above, in addition to the "predominance" requirement, Rule

9 23(b)(3) also requires plaintiffs to show that "a class action is superior to other methods

10 available for adjudicating the controversy at issue."

11         The court previously addressed the "superiority" prong in its 2010 order, noting that

12 "even certification of a class under FEHA would still leave the court with thirty-nine (the four

13 representative plaintiffs plus the 35 individual named plaintiffs) individual ADEA claims to

14 adjudicate." Dkt. 75 at 19. While the numbers have since changed, the issue remains the

15 same. The current complaint includes five representative plaintiffs and twenty-five

16 additional individual named plaintiffs, all of whom assert an ADEA claim.[5] See Dkt. 98.

17 Plaintiffs seek certification of a FEHA-only class, which even if granted, would leave 30

18 ADEA claims to be individually litigated, all based on the same facts that underlie the FEHA

19 claim.

20         At the hearing, the court raised its concern regarding "superiority," and directed

21 plaintiffs' supplemental briefing to "explain how they intend to proceed on their ADEA

22 claims if a FEHA class were to be certified," as "plaintiffs' plan directly affects the analysis

23 under Rule 23(b)(3), because if plaintiffs intend on pursuing their ADEA claims on an

24 individual basis (i.e., not as a collective action), then class treatment of the FEHA claims

25 _____

26      [5]Plaintiffs state in their supplemental brief that 26 of the 30 plaintiffs fall within the
alternative "class of 55" definition. Dkt. 145 at 3, n.4. Thus, if a class of 55 were to be
27 certified, there would be 26 (not 30) individual ADEA claims remaining. For purposes of the
"superiority" prong, the court finds no material difference between the "class of 133" proposal
28 and the "class of 55" proposal, and discusses them both together.

United States District Court

For the Northern District of California

1    may not be the superior method of adjudicating the controversy." Dkt. 142 at 3.

2          Plaintiffs responded by arguing that if they "prevail on their claims under the FEHA,

3    then their ADEA claims will not have to be litigated, because the plaintiffs will already have

4    been awarded the same damages they would have been awarded under FEHA." Dkt. 145

5    at 12.  Plaintiffs further explained that if they "lose on liability under the FEHA, they will also

6    necessarily lose on their ADEA claims, based on the fact that the defense of any

7    'reasonable factor other than age' available to the City under the ADEA is a far easier

8    standard to meet than the 'business necessity' defense available to it under the FEHA."  Id.

9          This explanation fails to address how the court would simultaneously litigate 30

10   individually-asserted ADEA claims along with a FEHA class action claim.  Instead, plaintiffs

11   compare the relative merits of the claims, arguing that the ADEA claims will ultimately have

12   no practical effect on the outcome of the case.  However, the "superiority" prong does not

13   focus on the outcome of the asserted claims, it focuses on the procedure for litigating those

14   claims.  Plaintiffs may be correct on both counts, that (1) if they succeed on their FEHA

15   claim, the ADEA claim becomes superfluous because of the bar against double recovery,

16   and (2) if the FEHA claim fails, the ADEA claim would necessarily also fail.  However,

17   plaintiffs overlook the fact that, before any FEHA liability is determined, both the FEHA

18   claim and the ADEA claim would need to be litigated side-by-side.  In order to show

19   "superiority" under Rule 23(b)(3), plaintiff must show that a class action would be superior

20   to allowing the plaintiffs to proceed individually on their claims.  Whether plaintiffs' ADEA

21   claims are more or less meritorious than their FEHA claim is irrelevant to the "superiority"

22   analysis.  What is relevant is the fact that the court would need to conduct 30 ADEA mini-

23   trials in addition to the FEHA class action trial, if FEHA certification were granted.  While

24   plaintiffs need not necessarily provide a trial plan, the fact that they carry the burden under

25   Rule 23(b)(3) requires that they provide some basis on which to find that class treatment is

26   superior.  Because plaintiffs have not at all discussed the procedure by which 30 ADEA

27   claims would be simultaneously litigated along with a class action FEHA claim, the court

28   has no basis on which to find that a class action is the superior method of litigating the

United States District Court

For the Northern District of California

1    asserted FEHA and ADEA claims.

2         At the hearing, plaintiffs' counsel attempted to address this concern by suggesting

3    that, if a FEHA class were to be certified, the ADEA claims would be dismissed.  This led

4    the court to ask for "further clarification" in supplemental briefing.  See Dkt. 142 at 3.

5    However, in their briefing, plaintiffs made no mention of dismissing their ADEA claims, and

6    thus, the court must consider the ADEA claims when determining whether class treatment

7    is the "superior" method of litigating plaintiffs' asserted claims.  The court also notes that

8    plaintiffs' counsel made the same suggestion in 2010, yet the ADEA claims still remain in

9    the case over four years later.  See Dkt. 151-1, Ex. 2 at 20 ("I think we're essentially

10   assuming we get the class certified . . . the whole case will be the disparate impact claim in

11   a class action . . . we're not going to pursue an ADEA claim for any of the individual

12   plaintiffs"); see also id. at 19-23.

13        In its 2010 order, the court noted that "plaintiffs' counsel suggested at the hearing

14   that in the event certification were granted, plaintiffs would consider dismissing the ADEA

15   claim from the action entirely."  Dkt. 75 at 19.  However, the court ultimately found that "a

16   suggestion of future dismissal does nothing to address the claims currently at issue and

17   upon which the court is required to base its decision."  Id.  Plaintiffs make the same

18   argument as they did in 2010, and the court reaches the same result.  The court must

19   evaluate "superiority" based on the case currently presented, not on a hypothetical pared-

20   down version of the case.  If the court were to grant certification on plaintiffs' FEHA claim,

21   the case would still contain 30 individual ADEA claims that would need to be individually

22   litigated.  Given the need for individual trials regarding 30 of the plaintiffs, involving the

23   same issues and evidence that would be presented in a class action, and given the

24   plaintiffs' failure to provide any explanation as to how the individual claims would be

25   litigated alongside the class claim, the court finds that plaintiffs have failed to show

26   "superiority" under Rule 23(b)(3).

27

28

**CONCLUSION**

For the foregoing reasons, the court finds that plaintiffs have failed to meet the "predominance" and "superiority" prongs of Rule 23(b)(3), and thus, the renewed motion for class certification is DENIED.

**IT IS SO ORDERED.**

Dated: May 8, 2015

_____
PHYLLIS J. HAMILTON
United States District Judge